KIDSCO INC., and Softkey International, Inc., Plaintiffs,

v.

William A. DINSMORE III, Maurice J. Duca, John W. Glynn Jr., Nywood Wu, William R. Rauth III, The Learning Company and Broderbund Software, Inc., Defendants.

Ernest HACK and Irving Kas, Plaintiffs,

v.

The LEARNING CO., et al., Defendants.

Civil Action Nos. 14649, 14657 and 14684.

Court of Chancery of Delaware, New Castle County.

Submitted: Nov. 21, 1995.
Decided: Nov. 22, 1995.
Revised: Dec. 4, 1995.

Pamela S. Tikellis, James C. Strum and Robert J. Kriner, Jr., of Chimicles, Jacobsen & Tikellis, Wilmington; Wolf, Haldenstein, Adler, Freeman & Herz, L.L.P.; and Abbey & Ellis, New York City; and Law Offices of Charles J. Piven, Baltimore, Maryland, for Class Plaintiffs in Civil Actions 14657 and 14684.

Richard D. Allen and Kurt M. Heyman, of Morris, Nichols, Arsht & Tunnell, Wilmington, and Paul Vizcarrondo, Jr., Theodore N. Mirvis, Paul K. Rowe, Miriam P. Longchamp, and Gregory P. Taxin, of Wachtell, Lipton, Rosen & Katz, New York City; and John F. Cannon, of Stradling, Yocca, Carlson & Rauth, Newport Beach, California, for The Learning Company Defendants.

Bruce M. Stargatt and James P. Hughes, Jr., of Young, Conaway, Stargatt & Taylor, Wilmington; and David Steuer, of Wilson, Sonsini, Goodrich & Rosati, Palo Alto, California, for Defendant Broderbund Software, Inc.

Edward P. Welch and Andrew J. Turezyn, of Skadden, Arps, Slate, Meagher & Flom, Wilmington; and Stephen P. Lamb, of Law Offices of Stephen P. Lamb, Wilmington; and Jay B. Kasner, George A. Zimmerman, and Steven J. Kolleeny, of Skadden, Arps, Slate, Meagher & Flom, New York City, for Plaintiffs Kidsco Inc. and Softkey International Inc.

### OPINION

JACOBS, Vice Chancellor.

Pending are motions for partial summary judgment and for a preliminary injunction in this action brought by Kidsco Inc. and its corporate parent, SoftKey International Inc. (collectively "SoftKey") against The Learning Company ("TLC"), TLC's directors, and Broderbund Software, Inc. ("Broderbund"). Joining in the motion for injunctive relief are the plaintiffs in two class actions brought by shareholders of TLC.

The motions arise out of a contest to acquire TLC. On July 31, 1995, TLC and Broderbund entered into an agreement contemplating a stock-for-stock merger of TLC into Broderbund. On October 30, 1995, SoftKey announced that it would conduct a two-tiered tender offer to acquire, for cash, a majority of TLC's outstanding shares, to be followed by a second-step stock-for-stock merger. To facilitate its tender offer, SoftKey simultaneously announced that it would solicit proxies to call a special stockholders meeting of TLC, pursuant to Section 2.3 of TLC's by-laws, to replace TLC's directors with SoftKey nominees. In response to that announcement, the TLC Board amended TLC's by-laws on November 6, 1995 to extend from 35 days to 60 days the minimum time for calling a stockholder-initiated special board meeting. As a result of that amendment, no meeting to replace the TLC Board may take place until 25 days or so after the Broderbund transaction is first considered by TLC stockholders.

The plaintiffs challenge the November 6 by-law amendment as a violation of their contract rights and as a breach of the defendants' fiduciary duties. On these motions they seek the by-law amendment's invalidation. After expedited discovery and briefing, the matter was argued on November 21, 1995. This is the Opinion of the Court on the plaintiffs' motions for partial summary judgment and a preliminary injunction.

### I. THE FACTS

TLC, a Delaware corporation, produces and distributes educational personal computer software products for use at home and in school. As of June 30, 1995, TLC had outstanding 7,468,292 shares of common stock, which are quoted on the NASDAQ National Market ("NASDAQ"). On July 31, 1995, the last trading day before the announcement of the proposed Broderbund merger, the closing sales price was $39 per common share.

At that price TLC's value is approximately $291 million.

Broderbund is a Delaware corporation engaged in developing and distributing a broad range of personal computer software for the home, school and small business markets. With 20,507,247 outstanding common shares (as of May 31, 1995) quoted on NASDAQ at $72 per share (as of July 31, 1995), Broderbund's market capitalization is approximately $1.5 billion.

SoftKey is a Delaware corporation that is the product of a 1993 merger of three software companies.[1] SoftKey develops and distributes consumer software, produced primarily on CD–ROM, for personal computers. On October 30, 1995, SoftKey announced an agreement to merge with Minnesota Educational Computing Corporation ("MECC"), a producer of children's educational software designed for use in the home and at school. That same day, SoftKey launched its cash tender offer for TLC and commenced its campaign to replace the TLC board.

The individual defendants are the five members of TLC's board of directors. William A. Dinsmore III ("Dinsmore") is the Chief Executive Officer of TLC, and the owner of 70,769 TLC shares and options to purchase a further 329,477 shares. Maurice J. Duca ("Duca") is the Chairman of the Board and the owner of 15.7% of the outstanding shares of TLC. John Glynn and Nywood Nu have been non-employee directors of TLC since 1984 and 1985, respectively. William R. Rauth III is a non-employee director of TLC, and a partner of a Newport Beach, California law firm that has served as TLC's outside counsel over the years.

## A. The Broderbund Merger

On July 31, 1995, the TLC board announced that it had approved a merger agreement with Broderbund. The announcement culminated a review by the TLC board of strategic alternatives and an assessment of Broderbund's complementary strengths. Convinced that TLC must become larger and obtain greater resources to expand its publishing and distribution capabilities to compete effectively in the educational software industry, the board decided that it would be in TLC's best interests to merge with Broderbund. In TLC's proxy materials disseminated in connection with the stockholders meeting (then scheduled for November 9) to vote on the proposed merger, the board explained that Broderbund and TLC have many complementary product lines and product development philosophies, and expressed the belief that TLC will benefit from Broderbund's experienced management and greater investment resources. The board recommended that shareholders approve the merger.

Under the July 31 merger agreement TLC shareholders would receive .8125 shares of Broderbund common stock for each share of TLC common stock. The TLC board agreed to except the Broderbund merger from the TLC shareholder rights plan ("rights plan") which was adopted in June 1994 to deter unsolicited takeover attempts. TLC covenanted that it would not disable the rights plan in favor of any other prospective purchaser of TLC without Broderbund's consent. TLC also committed not to solicit, negotiate, or facilitate a competing acquisition offer, and agreed to a mutual break-up fee of $10 million if the merger failed to occur. TLC reserved the right, however, to terminate the merger agreement if the board decided to accept a "Superior Proposal."[2]

Messrs. Duca and Dinsmore, who own approximately 16.5% of TLC's stock, agreed to vote their shares in favor of the Broderbund merger. Broderbund also indicated that it would enter into an employment contract with Dinsmore, under which Dinsmore would serve as President of TLC for three years

---

1. Wordstar International Incorporated, SoftKey Software Products Inc. and Spinnaker Software Corporation, all of which combined pursuant to an agreement dated August 17, 1993.

2. A "Superior Proposal" is defined in the merger agreement as a "proposal [that] identifies a price or range of prices for [TLC] ... [that], based on the advice of TLC's investment bankers, the Board of Directors of TLC has determined is financially more favorable to the stockholders of TLC than the terms of the [Broderbund] Merger."

following the merger. Broderbund would also enter into a consulting agreement with Duca, under which Duca would provide consulting services to Broderbund of up to one day per month over a three year period.

The board scheduled a special shareholders meeting of TLC to vote on the Broderbund merger for November 9, 1995. TLC and Broderbund disseminated their Joint Proxy Statement/Prospectus relating to the proposed merger, and also began soliciting proxies, on October 11, 1995.

### B. *The SoftKey Tender Offer*

Although the TLC/Broderbund transaction had been publicly known since July 31, SoftKey did not make its bid for TLC until October 30, 1995, only days before the scheduled stockholders meeting. With no prior communication to TLC, SoftKey announced a tender offer for 50.1% of outstanding TLC common stock for $65 per share cash as the first step of a planned takeover of TLC.[3] Simultaneously, SoftKey filed this action seeking a court-ordered postponement of the November 9 TLC shareholders meeting to vote on the Broderbund merger. Regarding the second step of its planned acquisition, SoftKey disclosed that it intended to exchange SoftKey shares valued at $65 for each outstanding TLC share after the close of the tender offer in a merger of TLC into Soft-Key.

3. Mr. Dinsmore and Mr. Kevin O'Leary, SoftKey's President, did meet once in June 1994. O'Leary remembers the meeting as a discussion of a potential business combination. Dinsmore recalls it as a discussion of a possible joint distribution arrangement. Both agree that the discussion went no further than a single meeting.

SoftKey explains that it failed to approach TLC earlier and decided to launch a tender offer 91 days after TLC announced its intention to merge with Broderbund and 10 days before the TLC shareholder vote on the Broderbund merger proposal, because SoftKey first desired to conclude its friendly merger agreement with MECC, announced the same day.

4. Before it was amended on November 6, § 2.3 of the TLC by-laws read as follows:

*Special Meetings.* Special meetings of stockholders, for any purpose or purposes, unless otherwise prescribed by statute or by the Certificate of Incorporation, may be called at any time by the Board of Directors, or by the Chairman of the

Most importantly for present purposes, SoftKey also announced its intent to solicit the holders of 10% of TLC shares to make demand upon the TLC board to call a special meeting pursuant to Section 2.3 of TLC's by-laws.[4] The purpose of the contemplated special meeting was to remove all of TLC's current directors and replace them with three SoftKey executives who would dismantle the TLC rights plan and thereafter implement the SoftKey takeover proposal. Thus, the sole purpose of the SoftKey-initiated special meeting was to facilitate SoftKey's hostile offer by removing the major obstacle to it.

### C. *Events Leading to the By-law Amendment*

After it learned of the SoftKey tender offer, TLC assembled a team of advisers. TLC also issued a press release requesting the shareholders to defer making a decision with respect to SoftKey's tender offer until after the TLC board had the opportunity to evaluate it.

On November 1, 1995, Messrs. Duca, Dinsmore and Rauth, together with TLC advisors, met with Broderbund representatives and urged them to consider improving the terms of the TLC/Broderbund merger agreement.

Board, or by the President, or by one or more stockholders holding shares in the aggregate entitled to cast not less than ten percent (10%) of the votes at that meeting. Such request shall state the purpose or purposes of the proposed meeting. Upon request in writing sent by registered mail to the President, Vice President or Secretary, or delivered to any such officer in person, by any person entitled to call a special meeting of stockholders, it shall be the duty of such officer forthwith to cause notice to be given to the stockholders entitled to vote that a meeting will be held at a time requested by the person or persons calling the meeting, which shall be not less than thirty-five (35) days nor more than sixty (60) days after the receipt of such request unless the meeting is called by the Board of Directors.

The amended by-law substitutes 60 days and 90 days for 35 days and 60 days, and adds the following sentence:

"Any request purporting to schedule a special meeting for a date fewer than sixty (60) days after receipt shall be deemed a request to hold the meeting on the sixtieth day after receipt."

On November 2, 1995, the full TLC board met for three hours to review the SoftKey takeover proposal. No materials were provided to board members before the meeting, but Morgan Stanley, TLC's financial advisor, furnished the board a preliminary financial analysis of the SoftKey proposal, which the directors reviewed. At that point, Morgan Stanley was not asked to, and did not, opine on the financial fairness of the SoftKey offer. The TLC board also discussed issues of timing, strategy and its legal responsibilities with regard to the SoftKey bid, the Broderbund agreement, or any improved proposal that Broderbund might make.

On November 3, 1995, Broderbund proposed to TLC an improved merger exchange ratio of 0.92 shares of Broderbund stock for each TLC share. In exchange, however, Broderbund demanded an increase in the "break-up" fee (payable by either side under specified circumstances) from $10 million to $20 million. In a 15 to 20 minute teleconference that same day, the full TLC board, with TLC's advisors participating, considered Broderbund's proposed revised terms and the board's duties and options with respect to the SoftKey offer. The board concluded by reaffirming its belief in the strategic benefits of the Broderbund merger transaction and by determining not to abandon it in order to negotiate with SoftKey. The board also concluded that the break-up fee Broderbund was demanding was unacceptable, and directed its representatives to try to persuade Broderbund to further improve the merger exchange ratio.

During the November 3 teleconference, the board was advised that if an improved Broderbund merger agreement were signed, the November 9 shareholders meeting would have to be postponed to enable the proxy materials relating to the merger to be amended and receive SEC "clearance". Special counsel also advised, in that connection, that it might be appropriate to amend TLC's special meeting by-law to empower the directors to lengthen the time available for scheduling a shareholder-initiated special meeting. TLC's counsel committed to investigate the advisability of such an amendment.[5]

Over the next two days, TLC continued to negotiate with Broderbund and refused to consider the SoftKey offer. By Sunday evening, November 5, Broderbund had agreed to accept a break-up fee of $15 million, plus up to $3 million in expense reimbursement, rather than the $20 million it had earlier demanded. However, Broderbund was not willing to increase the merger exchange ratio above 0.92 Broderbund shares for each share of TLC.

On Monday morning, November 6, TLC announced that the TLC shareholders special meeting to vote on the Broderbund merger would be postponed from November 9 to a date to be determined. On November 21, 1995, TLC announced that that shareholders meeting would be held on December 11, 1995.

### D. The By-law Amendment

Later on the morning of November 6, TLC's legal and financial advisors met with Messrs. Dinsmore and Rauth. At that time the issue of amending TLC's special meeting by-law was again raised. TLC's counsel considered this action to be advisable principally because the revision of the Broderbund merger proxy materials would likely delay a shareholder vote until late November or early December, yet under the existing special meeting by-law provision, SoftKey (and other stockholders whose holdings aggregated 10% of TLC stock) could demand a meeting that would have to be scheduled as early as December 11. TLC's counsel advised that unless TLC amended the special meeting by-law to permit the board to extend the time in which it could schedule a SoftKey-initiated meeting, TLC shareholders would be left in an exposed position if the Broderbund merger proposal was turned down. In that event the TLC board would have little or no time to seek alternatives to the SoftKey two-tiered offer, including establishing an auction process, because the special meeting demanded by SoftKey would take place only days later.

---

5. It is not altogether clear whether this topic was addressed by the entire board. Mr. Dinsmore recalls the issue being raised on November 3; Mr. Wu does not.

Counsel advised the TLC board that it could avoid this problem by enlarging the time period in which to respond to a shareholder demand for a special meeting, from the current minimum 35 to maximum 60 day period to a minimum 60 to maximum 90 day period. Counsel presented a proposed by-law amendment that would accomplish that result. That proposed amendment provided that any demand received that purported to schedule the meeting earlier than 60 days later would be deemed a request to hold a meeting on the 60th day. See FN 4, *supra.*

In response to that advice, Mr. Dinsmore decided to convene a special board meeting on November 6 to consider whether to amend Section 2.3 of TLC's by-laws as described above. Messrs. Dinsmore and Rauth were present in person, Messrs. Wu and Glynn participated by telephone, and Mr. Duca was absent because his flight was delayed by weather conditions. Counsel explained the problem with the existing special meeting by-law, as well as the proposed solution. The participating directors unanimously approved the amendment to the by-law in less than 15 minutes. After Mr. Duca arrived in San Francisco later that day, he was informed of the board's action and executed a consent to the by-law amendment the same day.

The urgency with which TLC's meeting on the by-law amendment was conducted appears to have been a direct result of a press release SoftKey issued early on the morning of November 6. The press release stated that SoftKey had begun to solicit other stockholders to call a special meeting to remove the TLC board, elect the SoftKey executive nominees, and implement the SoftKey tender offer. During the two days following this announcement, SoftKey gathered letters of demand from stockholders holding 10% or more of TLC's shares, calling for a special meeting to be held 35 days later, on December 13, 1995. SoftKey delivered these letters to TLC on November 8, 1995. By then, however, the TLC board had already amended Section 2.3 of TLC's by-laws in the manner described above.

On November 7, the full TLC board met and formally approved the revised Broder-

bund merger terms and rejected the SoftKey tender offer. The board's view was that the combination of TLC and Broderbund would uniquely position the combined entity to participate in the substantial growth expected in the educational software market, while a takeover by SoftKey would be unlikely to achieve long term business or financial success. The board, therefore, continued to believe that the Broderbund merger, as revised, was in the shareholders' best interests. Furthermore, in its November 8 Schedule 14D-9 filing, the board explained that it had adopted the by-law amendment "in order to assure that any [special meeting called for the purpose of removing current board members and replacing them with SoftKey nominees] be conducted in an orderly time frame and to assure that the timing of the SoftKey Offer does not prevent the Company from protecting stockholder value under all possible circumstances...."

On November 13, TLC issued a Notice of Meeting pursuant to the amended by-law, rather than the original by-law, calling the special stockholders meeting for January 8, 1996, rather than the December 13, 1995 meeting originally demanded by SoftKey. Beginning November 10, 1995, SoftKey began soliciting proxies in support of its proposal to replace TLC's board. SoftKey's proxy materials disclosed that the meeting to vote on SoftKey's proposals will be on either December 13, 1995 or on January 7, 1996, depending upon whether the pending motions are granted or denied.

## II. THE APPLICABLE STANDARDS AND THE PARTIES' CONTENTIONS

### A. Introduction.

To appreciate what is at stake and how the parties' contentions arise, some perspective is helpful. This case arises because SoftKey, the hostile bidder, has chosen a strategy that involves coupling an unsolicited tender offer with a proxy contest to replace the incumbent board. That strategy has been developed because over the past decade target company boards have successfully used anti-takeover defenses, particularly the "poison

pill" rights plan, either to defeat unwanted bids or to force the bidders to raise their price. Replacing the incumbent directors is viewed as an efficient way to eliminate the target company's ability to utilize these anti-takeover defenses. *See Unitrin, Inc. v. American General Corp.*, Del.Supr., 651 A.2d 1361, 1379 (1995) (*"Unitrin"*).

SoftKey has deployed that strategy here. Because the incumbent TLC board has kept the rights plan in place, exempting only Broderbund from its coverage, SoftKey seeks to replace that board. A special stockholders meeting is critical to removing the incumbent directors because TLC's certificate of incorporation prohibits stockholder action by written consent in lieu of a meeting. Equally critical is the timing of that meeting. SoftKey, for tactical reasons, desires to hold the meeting to oust the incumbent directors as soon as possible after the scheduled December 11 meeting to consider the Broderbund offer. Under the original by-law, the SoftKey-demanded special meeting would take place on December 13, 1995, only two days thereafter. That sequence—two meetings, two days apart—would compress the vote on the SoftKey offer (which would take the form of a referendum on the TLC directors' continued incumbency) and the vote on the merits of the Broderbund transaction into a very narrow time frame. Under the adopted by-law amendment, the SoftKey-initiated special meeting will be delayed for 25 days, until January 8, 1996. That delay enables the TLC board to present the Broderbund transaction to TLC's shareholders without the distraction of a concurrent proxy solicitation focused upon the directors' incumbency. Moreover, if the Broderbund deal is disapproved, that 25 day period would give the TLC board time to explore and develop an alternative transaction on improved terms, whether through an auction or private negotiation, with SoftKey, Broderbund, or some third party. It is the issue of timing—the 25 day delay—that drives the motions being decided here.

### B. *Applicable Standards.*

Plaintiffs seek both a preliminary injunction prohibiting TLC's enforcement of the by-law amendment to delay the SoftKey demanded special meeting, and partial summary judgment adjudicating the invalidity of the by-law amendment as a matter of law.

The standards applicable to a motion for preliminary injunction are well established. Such relief will be granted if the moving party demonstrates a reasonable probability of success on the merits, that irreparable harm will occur absent the injunction, and that the balance of equities favors granting the injunction. *QVC Network, Inc. v. Paramount Communications Inc.*, Del.Ch., 635 A.2d 1245, 1261 (1993); *aff'd*, Del.Supr., 637 A.2d 34 (1994); *Unitrin*, 651 A.2d, at 1371. On a motion for summary judgment, the moving party must demonstrate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Empire of Am. Relocation Servs. v. Commercial Credit Co.*, Del.Supr., 551 A.2d 433, 435 (1988).

### C. *The Contentions.*

Plaintiffs claim that this Court should grant their motion for summary judgment and find the by-law amendment invalid as a matter of law, because at the time of the November 6 amendment the shareholders had a vested contract right—one that the TLC board was not free to abrogate—to hold the special meeting on December 13, 1995. Plaintiffs argue that those rights vested because SoftKey had detrimentally relied upon the original by-law by seeking a stocklist, by preparing and filing proxy materials with the SEC, and by obtaining stockholder support for the special meeting.

In support of their motion for a preliminary injunction, plaintiffs contend that they are entitled to relief under any or all of four distinct fiduciary duty doctrines. First, they argue that the by-law amendment postponing the stockholders' ability to remove the directors was adopted to enable the directors to remain in office and to control the process of conducting a merger or sale of the company. That action, plaintiffs argue, is invalid because it was taken by directors for the primary and improper purpose of entrenching the board in office. *Schnell v. Chris-Craft Industries*, Del.Supr., 285 A.2d 437, 439

(1971); *Lerman v. Diagnostic Data, Inc.,* Del.Ch., 421 A.2d 906, 914 (1980).

Second, plaintiffs claim that because the by-law amendment was not approved by a majority of disinterested directors, the TLC defendants must demonstrate the amendment's entire fairness. *Cinerama, Inc. v. Technicolor, Inc.,* Del.Supr., 663 A.2d 1156, 1164 (1995). Plaintiffs argue that the defendants cannot meet that burden because the by-law amendment would deprive TLC shareholders of their right to choose whether to replace the board, and because in adopting the by-law amendment the TLC board did not satisfy its duty of care.

Third, plaintiffs maintain that the postponement of a special meeting to replace the incumbent directors through the by-law amendment constituted an improper manipulation of the corporate electoral machinery that casts upon the TLC defendants the burden of justifying their actions. *Aprahamian v. HBO & Co.,* Del.Ch., 531 A.2d 1204, 1206–07 (1987). That burden, plaintiffs contend, is severe, because the TLC board acted "for the primary purpose of impeding the exercise of stockholder voting power," and therefore must demonstrate a "compelling justification" for its actions. *Blasius Indus. v. Atlas Corp.,* Del.Ch., 564 A.2d 651, 661 (1988) ("*Blasius*").

Fourth, plaintiffs contend that the adoption of the by-law amendment cannot satisfy the "enhanced scrutiny" standard applicable to anti-takeover defensive measures under *Unocal Corp. v. Mesa Petroleum Co.,* Del. Supr., 493 A.2d 946, 954–55 (1985) ("*Unocal*"), as explicated in *Unitrin.* Specifically (it is argued), the TLC Board has not demonstrated that it had reasonable grounds to believe that SoftKey's offer threatened corporate policy and effectiveness, because the board never investigated the substantive merits of that offer. The plaintiffs claim that the only threat the TLC directors perceived was to their board positions, and that threat is not cognizable under *Unocal.* Plaintiffs further argue that the adoption of the by-law amendment was not reasonable in relation to the threat posed, because it precluded the stockholders' ability to remove the directors from office on December 13 pursuant to the original by-law.

On any or all of these grounds, plaintiffs urge, a preliminary injunction must issue.

Defendants ardently contest all these arguments. They contend that (a) Section 2.3 of the by-laws was always subject to amendment by the directors, whose power to do that was limited only by the proper exercise of their fiduciary duties, (b) that no contractual "right" prohibiting the exercise of that directorial power ever came into existence; and that (c) the directors breached no fiduciary duty by amending the by-law in these circumstances.

More specifically, the TLC defendants argue that their motive in adopting the by-law was not to entrench themselves, but to ensure that the board was in a position to negotiate to maximize shareholder value under all circumstances; and that the decision to amend the by-law was well informed and was made by a majority of disinterested directors. Defendants state that under the original by-law, SoftKey could have called a special meeting as early as December 11 to consider whether the board should be replaced with SoftKey nominees. By postponing the SoftKey special meeting, the TLC board sought to guard against the possibility that TLC's shareholders might reject the proposed Broderbund merger and immediately thereafter be faced with a meeting to replace the TLC board with SoftKey's representatives. In such a circumstance, the board would have little or no time (and only tenuous authority) either to negotiate with SoftKey to obtain a better price or transaction for shareholders, or to seek alternatives to the SoftKey offer by, for instance, conducting an auction. TLC argues that the timing of the proposed SoftKey special meeting posed a legitimate threat, to which the by-law amendment was a proportionate response because (1) the amendment only delays but does not eliminate the ability of stockholders to call a special meeting to replace the incumbent board, and (2) it enables the board to develop an alternative transaction that serves the best interests of TLC shareholders as a group.

Stated differently, defendants argue that they did not act to manipulate the corporate machinery, or for the "primary purpose" of impeding the exercise of stockholder voting power. Rather, they acted to preserve the TLC stockholders' ability to approve the Broderbund transaction or, failing that, to afford TLC stockholders the opportunity to consider an alternative transaction superior to the current Softkey proposal. Thus, the by-law amendment was intended as a defense against an inadequate offer and the hostile bidder's concomitant effort to replace the board. Accordingly, defendants argue, the appropriate standard under which their conduct must be reviewed is the *Unocal/Unitrin* standard, which their conduct easily satisfies.

\* \* \*

Having considered these contentions, I conclude that both motions must be denied. My reasons follow.

### III. *THE SUMMARY JUDGMENT MOTION*

■ I address first the plaintiffs' summary judgment motion, because if its basic premise is correct, injunctive relief must follow as a matter of course. The plaintiffs argue that as of November 6, 1995, when the directors amended Section 2.3 of the by-laws, the shareholders (including SoftKey) who demanded the special meeting had a vested contract right to have that meeting called under the terms of the by-law as it then existed. Stated differently, the plaintiffs claim that they had an enforceable contract right to proceed under the then existing by-law, and the directors lacked any power to amend it. The difficulty with the argument is that its "vested right" premise is wrong.

8 *Del.C.* § 109(a) provides that the power to adopt, amend or repeal by-laws shall be in the shareholders entitled to vote, except that the certificate of incorporation may also confer that power upon the directors. It is undisputed that the TLC certificate of incorporation expressly authorizes the directors to amend or repeal the by-laws without obtaining shareholder approval. Therefore, although the by-laws are a contract between the corporation and its stockholders (*Centaur Partners, IV v. National Intergroup, Inc.*, Del.Supr., 582 A.2d 923, 926 (1990)), the contract was subject to the board's power to amend the by-laws unilaterally.

SoftKey claims that its right to proceed under the original by-laws had vested by November 6, because SoftKey had detrimentally relied upon by seeking a stocklist, by preparing draft proxy materials for the to-be-demanded special meeting, and by soliciting the support of shares sufficient in number to enable SoftKey to submit a demand for a special meeting.

Plaintiffs cite no authority that supports their vested rights claim. Indeed, the authors of a noted Treatise on Delaware Corporation Law state that because of the statutorily reserved power to amend the corporate charter, very probably "the only 'vested right' left is that specified in [8 *Del.C.* § 394]," which prohibits a statutory charter amendment from "[taking] away or [impairing] any remedy ... against any corporation or its officers for any *liability* which shall have been previously incurred." III Folk, Ward & Welch, *Folk on the Delaware General Corporation Law*, § 394.2.2. (emphasis added).[6] The "vested right" being claimed here does not fall within that category.

On the contrary, this Court has held that where a corporation's by-laws put all on notice that the by-laws may be amended at any time, no vested rights can arise that would contractually prohibit an amendment. *Roven v. Cotter*, Del.Ch., 547 A.2d 603, 608 (1988). Here, Section 7.8 of TLC's by-laws expressly provide that subject to the Delaware General Corporation Law and the certificate of incorporation, "the Board of Directors may by the affirmative vote of a majority of the entire Board ... amend or

---

**6.** Consistent with § 394, no "contractual" right to maintain an existing by-law has ever been recognized, except in the compelling (and quite different) context of a directors' individual indemnification rights that became perfected before the board amended its by-laws to eliminate those rights. *Salaman v. National Media Corp.*, Del.Super., C.A. No. 92C–01–161, Del Pesco, J. (Oct. 8, 1992).

repeat these By-laws...." [7]

However, assuming without deciding that a vested right to proceed under the original by-laws might arise in some circumstances, no such right arose here. As of November 6, TLC shareholders had not taken action. For such a right to vest, the shareholders must, at the very least, have perfected their right to demand a meeting as of that date. However, the number of shares needed to make a demand were not accumulated, and no demand was made, until November 8, 1995—two days later.

\* \* \*

For these reasons, the plaintiffs' vested rights argument (and, consequently, their motion for summary judgment) must fail. The TLC directors were empowered to amend the special meeting by-law, subject only to their obligation to exercise that power in accordance with their fiduciary duties. The remainder of the plaintiffs' arguments are devoted to their claim that in amending the by-laws, the TLC directors contravened one or more of those fiduciary duties. To those arguments I now turn.

## IV. *THE PRELIMINARY INJUNCTION MOTIONS*

As earlier noted, plaintiffs challenge the by-law amendment on the basis of four separate fiduciary duty doctrines. That array of challenges raises the question of what is the appropriate analytical framework in this factual setting, and what is the correct application of the applicable standards of review. In the end, I conclude that because the by-law amendment was a defensive response to a hostile takeover bid, its validity must be determined under the *Unocal/Unitrin* standard, and that the "compelling justification" standard called for by *Blasius* is not applicable. To arrive at that point, the Court first addresses, and rejects, the plaintiffs' arguments that (a) the amendment is invalid because it was adopted to entrench the board in office, and (b) the amendment should be evaluated under the entire fairness standard,

because it was not adopted by a majority of disinterested directors and because in adopting the amendment the board was not properly informed.

### A. *The "Entrenchment Motive" Claim.*

The plaintiffs' "entrenchment motive" argument fails for lack of factual support. The by-law amendment *might* possibly "perpetuate" the board in office for 25 days, but it will not "entrench" the board in any meaningful sense, nor was it intended to do so. The by-law was adopted (i) to enable the board to present the Broderbund transaction to TLC's shareholders without having simultaneously to engage in a distracting proxy fight to retain their incumbency, and (ii) if the Broderbund deal were rejected, to give the board a reasonable time to explore whether a superior alternative transaction could be developed, either in an auction or negotiated with SoftKey, Broderbund, or some other party.

In neither case would the amendment perpetuate the current board in office. If the Broderbund transaction is approved, the TLC board will disappear, and only two of TLC's five directors will become directors of Broderbund. If the Broderbund deal is rejected and no alternative transaction is developed (and approved by shareholders), then the shareholders will be free, at the January 8 special meeting, to remove the current board if they so desire.

Thus, all that the plaintiffs have shown is a possibility that the directors' tenure may be enlarged for an additional 25 days. That possibility does not an entrenched board make.

### B. *The "Entire Fairness" Claim.*

The plaintiffs' second claim is that the by-law amendment must be evaluated under—and fails—the entire fairness standard. Plaintiffs' claim rests upon two alternative arguments: (i) that the by-law amendment was approved by an interested board and (ii)

---

**7.** TLC By-law Section 7.8 undercuts SoftKey's contention that its rights vested because it detrimentally "relied" on the then-existing by-law. Clearly any such reliance by SoftKey was not justifiable, since SoftKey was on notice that the by-law was subject to amendment by the TLC board.

that the board did not adequately inform itself before adopting the amendment.

### 1. Director Self Interest.

■ It is undisputed that the by-law amendment was approved by four of TLC's five directors at the November 6 directors meeting, and that the fifth director, Mr. Duca, consented to the amendment that same day after his delayed flight arrived at San Francisco. It is also undisputed that two of the directors, Messrs. Wu and Glynn, were disinterested. The plaintiffs contend, however, that Messrs. Dinsmore and Rauth had conflicting self interests, with the result that the amendment was not approved by a majority of disinterested directors.

The Court need not determine the disinterestedness of Mr. Dinsmore or Mr. Rauth, because it is satisfied that Mr. Duca's consent to the amendment that same day constituted a vote by a third independent, disinterested director. Mr. Duca owns approximately $60 million worth of TLC stock and is TLC's largest stockholder. He is not a TLC employee, nor is he under the control of any other TLC director. Although Mr. Duca stands to receive monies under an agreement to consult with Broderbund not more than one day per month, Duca's financial interest under that agreement was far outweighed by his interest in maximizing the value of his 15.7% stock interest in TLC. I therefore conclude that defendants would probably prevail at trial on their contention that Duca had no material conflicting self interest that would cause him to act other than in the best interests of TLC shareholders generally.

Accordingly, the plaintiffs have failed to establish that by-law amendment was not approved by a majority of disinterested, independent directors.

### 2. Director Due Care.

■ Plaintiffs also argue that the TLC directors did not make an adequately informed decision to adopt the by-law, because (i) the amendment was approved at a 15 minute meeting solely on the basis of the advice of TLC's outside counsel and (ii) although the amendment was in response to the SoftKey offer, the directors never investigated SoftKey, or the adequacy of the SoftKey offer, and did not have, let alone request, an opinion from its financial advisor as to the financial adequacy of the SoftKey offer.

Plaintiffs confuse the information required to make an informed judgment about amending the by-law with the information required to evaluate the merits of the SoftKey offer. That latter evaluation was made on November 7, 1995, the following day. No extensive financial analysis of SoftKey or its offer was required to consider the by-law amendment the day before. All that was needed on November 6 was information sufficient to enable the board to understand the significance of a change from a 35–to–60 day period to a 60–to–90 day period. The considerations supporting the significance of the proposed amendment—the time periods of the SoftKey and Broderbund meeting dates and the board's determination to preserve the Broderbund merger (which it viewed as strategic) and preserve the option of an auction if that merger were voted down—were all matters previously investigated by special counsel after the November 3, 1995 teleconference and explained to the directors at the November 6 meeting. That the discussion of these matters at the November 6 meeting was brief does not evidence, let alone establish, that the directors were grossly negligent in approving the by-law amendment.

\* \* \*

Because the plaintiffs have failed to satisfy the Court that the by-law was the product of an interested vote or of a lack of due care, the "entire fairness" standard is not implicated. Therefore, no probability of ultimate success on the merits of this claim has been established.

### C. The Unocal (and Blasius) Claims.

#### 1. Preliminary.

Finally, the plaintiffs contend that the by-law amendment fails under the "enhanced scrutiny" standard of Unocal, as explicated in Unitrin. Under that standard, to merit the protection of the business judgment rule

the board must carry a two part burden. First, it must satisfy a "reasonableness" test under which the board of directors must demonstrate that it had reasonable grounds to believe that a danger to corporate policy and effectiveness existed. Second, it must satisfy a "proportionality" test, under which the board of directors must demonstrate their defensive response was reasonable in relation to the threat posed, meaning that the response was neither preclusive nor coercive and that it falls within a range of reasonable responses to the threat posed. *Unitrin,* 651 A.2d, at 1372, 1384–86. The plaintiffs argue that this standard is not satisfied because (a) the only "threat" posed by the SoftKey offer is to the directors' continued incumbency, which is not a cognizable threat under *Unocal,* and (b) even if SoftKey's tender offer and its campaign to oust the TLC board is deemed to be a threat, the by-law amendment was a disproportionate, "draconian," response, because it precludes altogether the shareholders' opportunity to decide whether to retain the current board at a December 13, 1995 meeting.

The plaintiffs also argue, both as part of their *Unocal* contentions and as a free-standing claim, that the by-law amendment must be invalidated under *Blasius,* because it was enacted for the primary purpose of impeding the exercise of stockholder voting power, and, as a consequence, requires the board to demonstrate a compelling justification for its action. 564 A.2d, at 661. The inclusion of this claim raises the question of what form of analysis—*Blasius, Unocal,* or an amalgam of both—is to be employed. Because I conclude that the appropriate analytical framework is that mandated by *Unocal* and *Unitrin,* I address the *Blasius* arguments first, and thereafter evaluate the by-law amendment under the *Unocal/Unitrin* standard.

### 2. The Blasius Claim.

In assessing the role of *Blasius,* it is necessary to distinguish between board action that purposefully interferes with the exercise of shareholder voting rights (a) in circumstances unrelated to a tender offer or other contested acquisition (for example, a contested annual meeting to elect directors) and (b) in circumstances where an acquirer launches both a tender offer and a proxy fight to remove the board to facilitate the offer. In the former context the *Blasius* analysis would normally be applied in "free standing" form. However, in the latter context, the board action will "necessarily [invoke] both *Unocal* and *Blasius*" because both tests "recognize the inherent conflicts of interest that arise when shareholders are not permitted free exercise of their franchise." *Stroud v. Grace,* Del.Supr., 606 A.2d 75, 92, n. 3 (1992). (quoted in *Unitrin,* 651 A.2d, at 1379). In these circumstances, a board's unilateral decision to adopt a defensive measure "touching upon issues of control" that "purposefully disenfranchises its shareholders" will be evaluated under *Unocal.* However, even within that framework that board decision will be viewed as "strongly suspect . . . and cannot be sustained without a 'compelling justification.'" *Stroud,* 606 A.2d, at 92, n. 3.

■ Accordingly, the plaintiffs' *Blasius* claims in this case must be evaluated within the analytical framework of *Unocal.* Even so, however, there is a threshold issue: whether the board's action was of a kind that implicates *Blasius* at all. For the following reasons, I conclude that it was not.

■ The *Blasius* standard may be viewed as a particularization of the more general doctrine that "board action taken for the principal purpose of impeding the effective exercise of the stockholder franchise is inequitable and will be restrained or set aside in proper circumstances." *Stahl v. Apple Bancorp, Inc.,* Del.Ch., 579 A.2d 1115, 1122 (1990), *see Aprahamian,* 531 A.2d 1204; *Schnell,* 285 A.2d 437; *Lerman,* 421 A.2d 906.

In the cited cases, the board action found to constitute inequitable conduct relating to a shareholder vote, had the effect (and, in some cases, also the intent) of either (i) precluding effective shareholder action (as in *Schnell,* where a stockholders meeting was moved forward at the end stage of a proxy contest for control; as in *Lerman,* where an adopted by-law precluded the nomination of an opposing slate, and as in *Blasius,* where the board filled two newly created directorships with board nominees), *or* of (ii) "snatch[ing] victo-

ry from an insurgent slate on the eve of the noticed meeting" (as in *Aprahamian*, where a stockholders meeting was moved back near the conclusion of a proxy contest). *Stahl*, 579 A.2d, at 1123. Here, however, the board action—amending the by-law to give the board an additional 25 days to call a shareholder-initiated special meeting—was not enacted for the "primary purpose" of impairing or impeding the effective exercise of the franchise, nor will the challenged board action have that effect. The by-law amendment did not have the entrenchment purpose that motivated the board actions invalidated in the cases cited above. Rather, it was a defensive measure intended to enable the TLC board to present the Broderbund transaction to its shareholders in an environment that would provide the board a reasonable time to explore and develop other options if the Broderbund deal were rejected. Moreover, the by-law amendment would not preclude a shareholder vote on the directors' continued incumbency, but only delay by 25 days a stockholders meeting that on November 6 had neither been called nor legally demanded.

Our case law clearly establishes that board action of this kind, when taken as a defensive measure against a hostile tender offer coupled with a proxy contest, does not implicate the *Blasius* standard of review. In *Stahl, supra*, Chancellor Allen denied a preliminary injunction sought by a hostile tender offeror that simultaneously was pursuing a proxy contest to oust the board. The target company's board responded by delaying the company's annual meeting (for which a record date had already been set) to a later date still in conformity with the company's by-laws and 8 *Del.C.* § 211. The board's justification for the delay was that the stockholders' best interests would be served by delaying the vote until the company had a fair opportunity to explore and pursue alternatives to the hostile offer. The Court held that the act of deferring the annual meeting, where no meeting date had been set and no proxies had been solicited, did not impair or impede the effective exercise of the franchise to any extent. *See also, In re Time Incorporated Shareholder Litigation*, Del.Ch., C.A. No. 10670, Allen C., Mem.Op. at 64–68, 1989 WL

79880 (July 14, 1989) (refusing to apply *Blasius* standard to review board's decision to withdraw merger proposal requiring shareholder vote in favor of proposal not requiring a vote because the board acted within its broad statutory authority).

This case is functionally indistinguishable from *Stahl*. Here, the by-law amendment resulted in a brief deferral of a meeting that had not yet been demanded or called; and it was adopted for reasons similar to those validated in that case. Here, as in *Stahl*, "the franchise process [cannot] be said to be sufficiently engaged before the fixing of [the] meeting date to give rise to.... [the possibility of inequitable manipulation]." 579 A.2d, at 1123.

Accordingly, the by-law amendment will be reviewed under the *Unocal/Unitrin* standard.

### 3. *Application of Unocal/Unitrin.*

To start with the conclusion, I am satisfied that the TLC board action in amending the by-law is entitled to business judgment rule protection, because that conduct satisfies both the reasonableness and the proportionality tests of *Unocal* and *Unitrin*.

First, as to reasonableness, the plaintiffs argue that the only threat posed by the SoftKey offer was to the directors' incumbency. However, that characterization of the threat is made in a vacuum. It ignores the fact that SoftKey's purpose in replacing the board with SoftKey nominees, who intend to dismantle the TLC rights plan and approve SoftKey's offer, is to facilitate SoftKey's tender offer by circumventing the current board's negotiating power. Given SoftKey's strategic purpose, the TLC directors reasonably perceived that the timing of any SoftKey-initiated shareholders meeting could threaten (i) the shareholders' interest in making an informed choice about the Broderbund offer, free from the distraction of a concurrent proxy contest to replace the board, and (ii) TLC's (and the shareholders') interest in having in place a process that would yield the best possible value if the Broderbund transaction were turned down.

If the Broderbund transaction were rejected and the SoftKey meeting to consider removing the directors were held on December 13, 1995, the TLC directors would have no time to explore whether a transaction superior to the SoftKey offer could be developed. Thus, the risk was that TLC stockholders might be limited to a choice between retaining the existing board and accepting a SoftKey two-tiered proposal that had not yet been subject to negotiation or to any auction process. For these reasons, the TLC board reasonably perceived that the SoftKey offer and impending proxy contest posed a threat to corporate policy and effectiveness.

Second, the directors' response was proportionate to the threat. The by-law amendment was not draconian because it only delayed, but did not preclude, a shareholder vote. And the 25 day delay clearly fell within a range of reasonable alternatives. The board acted appropriately in responding to the last minute SoftKey offer by seeking to protect the ability of the stockholders to vote, up or down, on the pre-existing Broderbund merger, in a timeframe that would briefly delay SoftKey's special meeting so that the board would know the stockholders' wishes regarding the Broderbund merger, and then be in a position to exercise its fiduciary duties with knowledge of the stockholders' views. Here, as in *Stahl*, the board's response to the threat was "extremely mild." 579 A.2d at 1125. That response did not

preclude SoftKey's ability to call a special meeting, nor could it alter or influence the vote in any respect. The by-law amendment simply preserved an opportunity for TLC's board, if the Broderbund merger were rejected by the stockholders, to fulfill its duties to the shareholders to seek out the best value reasonably available. *Cf. MAI Basic Four, Inc. v. Prime Computer, Inc.*, Del.Ch., C.A. No. 10868, Hartnett, V.C., 1989 WL 63900 (June 13, 1989) (upholding directors' 42 day postponement of previously scheduled annual stockholders meeting to give the directors "reasonable time to find alternatives to Basic's new offer.").[8]

\*  \*  \*

I conclude that the plaintiffs have failed to establish probable success on the merits of any of their claims, and that injunctive relief must be denied.

## V. CONCLUSION

For the above reasons, the plaintiffs' motions for a preliminary injunction and for partial summary judgment are denied. **IT IS SO ORDERED.**

---

8. The plaintiffs argue that the amendment is an unreasonable response because the directors could achieve the same objective by disclosing, in their proxy solicitation materials for the Broderbund merger, what alternative steps the board would take if the merger were turned down. However, to interpret *Unocal* to require the TLC

board to solicit proxies in that fashion, would force the board to undercut (through its simultaneous presentation of "alternatives") its ability to forcefully advocate that the Broderbund transaction is in the best interests of TLC's shareholders. Nothing in *Unocal* requires this Court to place a board in that position.