# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

FRANCIS S. BRANIN, JR.,      :
     :
         Plaintiff,      :
     :
         v.      :      **C.A. No. 8481-VCN**
     :
STEIN ROE INVESTMENT COUNSEL,      :
LLC, STEIN ROE INVESTMENT      :
COUNSEL, INC., and ATLANTIC      :
TRUST GROUP, INC., together d/b/a      :
ATLANTIC TRUST PRIVATE      :
WEALTH MANAGEMENT,      :
     :
         Defendants.      :

## MEMORANDUM OPINION AND ORDER

Date Submitted: January 28, 2014
Date Decided: June 30, 2014

John M. Seaman, Esquire and Derrick B. Farrell, Esquire of Abrams & Bayliss LLP, Wilmington, Delaware, and Louis P. DiLorenzo, Esquire, Michael I. Bernstein, Esquire, and Michael P. Collins, Esquire of Bond, Schoeneck & King, PLLC, New York, New York, Attorneys for Plaintiff.

Robert J. Katzenstein, Esquire of Smith, Katzenstein & Jenkins LLP, Wilmington, Delaware, and John F. Cambria, Esquire and Daniella P. Main, Esquire of Alston & Bird LLP, New York, New York, Attorneys for Defendants.

NOBLE, Vice Chancellor

Plaintiff seeks indemnification for attorneys' fees and costs of more than $3 million for his litigation expenses spanning more than ten years. Defendants amended the expansively phrased indemnification provision to limit its broad reach soon after learning that plaintiff had been sued. Defendants contend that plaintiff had no vested right to indemnification and that any right was abrogated by the agreement's later amendment, and otherwise attempt to deny plaintiff recovery.

The parties have moved for judgment on the pleadings, arguing that the pertinent indemnification rights may be established or rejected as a matter of law without trial. Both motions for judgment on the pleadings are denied. Defendants' motion is denied because their interpretation of the indemnification provision is contrary to its terms. Plaintiff's motion is denied because factual issues remain concerning whether plaintiff acted in good faith and in a manner he reasonably believed to be within the scope of his authority.

## I. BACKGROUND

Plaintiff Francis S. Branin, Jr. ("Branin") became an employee of Stein Roe Investment Counsel LLC ("SRIC LLC"), a Delaware limited liability company, in July 2002.[1] SRIC LLC later was converted into a Delaware corporation, Stein Roe Investment Counsel, Inc. ("SRIC, Inc."),[2] which is a wholly-owned subsidiary of

---

[1] Verified Am. Compl. for Indemnification ("Compl.") ¶ 4.
[2] SRIC LLC was acquired by AMVESCAP PLC, which changed its name to Invesco Ltd. *Id.* ¶¶ 5, 15.

1

Atlantic Trust Group, Inc. ("Atlantic Inc."), also a Delaware corporation.[3] These entities (as well as others) do business as Atlantic Trust Private Wealth Management (collectively, with SRIC LLC, SRIC, Inc., and Atlantic Inc., the "Defendants") and offer wealth management and financial advisory services to private clients.[4] Branin is, and has been, jointly employed by SRIC Inc. and by one or more of its related entities, including Atlantic, Inc. and Atlantic Trust Private Wealth Management.[5]

A. *Branin Joins SRIC LLC and His Former Clients Become SRIC LLC Clients*

Before joining SRIC LLC, Branin was a principal/owner and the Chief Executive Officer of the investment management firm Brundage, Story & Rose ("Brundage"), which provided investment counseling to, and managed the assets of, high net worth individuals, families, and institutional clients.[6] In October 2000, a larger investment management firm, Bessemer Trust, N.A. ("Bessemer"), acquired Brundage's assets for a purchase price in excess of $75 million.[7] The principals of Brundage were offered at-will employment with Bessemer, which did not obtain any express covenant restricting them from competing or soliciting clients if they resigned.[8]

---

[3] *Id.* ¶ 11.
[4] *See id.* ¶¶ 7, 8, 11.
[5] *Id.* ¶ 12.
[6] *Id.* ¶ 22.
[7] *Id.* ¶ 23.
[8] *Id.* ¶¶ 24, 26.

The relationship between Branin and Bessemer soured, and Branin began meeting with SRIC LLC's President and CEO, William Rankin ("Rankin"), to discuss possible employment.[9] Rankin and Branin considered whether Branin's clients would follow him to SRIC LLC, and Branin explained that Bessemer's purchase of Brundage's goodwill was governed by a doctrine of New York law that prevented Branin from soliciting his former clients (the "*Mohawk* Doctrine").[10] Branin could, however, accept the business of former clients if they approached him or provide information to them if they sought it from him.[11]

Branin tendered his resignation to Bessemer on July 12, 2002, and executed an employment agreement to be effective that same date with SRIC LLC. Branin claims that both before and after joining SRIC LLC he did not solicit his former clients at Bessemer.[12] By May 31, 2003, however, Branin was managing thirty client accounts that he formerly managed at Bessemer.[13]

---

[9] *See id.* ¶¶ 27-29.

[10] The *Mohawk* Doctrine refers to an implied covenant imposed on the seller of a business which "precludes him from approaching his former customers and attempting to regain their patronage after he has purported to transfer their 'goodwill' to the purchaser." *Mohawk Maintenance Co. v. Kessler*, 52 N.Y.2d 276, 284 (N.Y. 1981).

[11] Compl. ¶ 30.

[12] *Id.* ¶ 35.

[13] *Id.* ¶ 39. These accounts apparently consisted of $228 million in client assets which Branin had managed at SRIC LLC. *Id.* He had managed $443 million in client assets at the time of his departure from Bessemer. *Id.* ¶ 38.

## B. *Bessemer Sues Branin*

On November 22, 2002, after several of Branin's former clients left Bessemer to resume their relationships with him at SRIC LLC, Bessemer sued Branin in New York (the "New York Action"), alleging improper solicitation of clients and impairment of the goodwill that Branin had sold to Bessemer.[14] The case dragged on until June 29, 2012, and its winding path toward resolution included an appeal to the United States Court of Appeals for the Second Circuit and its subsequent certification of a question to the New York Court of Appeals. The answer to the certified question and the subsequent litigation were favorable to Branin, and, after he rejected Bessemer's settlement offers, it unconditionally dismissed, with prejudice, any and all claims against Branin.[15]

## C. *SRIC LLC's Indemnification Provision and Branin's Efforts to Obtain Indemnification*

The parties agree that the operating agreement of SRIC LLC governs Branin's indemnification rights, although they disagree about which version of it applies.[16] When the events giving rise to Bessemer's claims against Branin

---

[14] *Id.* ¶ 41.

[15] *Id.* ¶ 59.

[16] Defs.' Opening Br. in Supp. of Defs.' Consolidated Mot. to Dismiss and for J. on the Pleadings as to Pl.'s Am. Compl. ("DOB"), Ex. 3 (Amended and Restated Limited Liability Company Operating Agreement (the "Agreement")). The Complaint contained two other counts based upon SRIC, Inc.'s bylaws and 8 *Del. C.* § 145, which the parties agreed Branin would withdraw, with prejudice, in exchange for Invesco Ltd.'s providing him a representation letter. Stipulation and Proposed Order of Dismissal of Counts II and III of the Verified Am. Compl. ¶¶ 1-2. The letter contains a promise of payment by Invesco Ltd. of any monetary judgment

4

occurred and when Bessemer sued him, SRIC LLC's operating agreement contained the following indemnification provision:

> 8.7 <u>Indemnification</u>. . . . To the full extent permitted by applicable law, each Member, Manager or employee of the Company shall be entitled to indemnification from the Company for any loss, damage or claim by reason of any act or omission performed or omitted by such Person in good faith on behalf of the Company and, as applicable, in a manner reasonably believed to be within the scope of the authority conferred on it by this Agreement, except that no Member, Manager or employee shall be entitled to be indemnified in respect of any loss, damage or claim incurred by it by reason of such Person's gross negligence or willful misconduct by such Person with respect to such acts or omissions; provided, however, that any indemnity under this Section 8.7 shall be provided out of and to the extent of Company assets only, and no Member shall have personal liability on account thereof.[17]

The Agreement was subject to amendment upon a two-thirds vote of the Percentage Interest held by SRIC LLC's members.[18]

A few months after Bessemer sued Branin, SRIC LLC adopted a second amendment to its operating agreement on February 11, 2003, which added an exclusion that sought to preclude Branin's indemnification claim:

---

awarded to Branin if the named Defendants do not pay it. Pl.'s Br. in Opp'n to Defs.' Mot. for J. on the Pleadings and in Supp. of Cross-Mot. for J. on the Pleadings ("POB") at 14.

[17] DOB, Ex. 4 (First Amendment to Amended and Restated Limited Liability Company Operating Agreement (the "First Amendment")). The First Amendment was executed on February 12, 2002. Because Branin did not join SRIC LLC until July 2002, the earlier version of the indemnification provision has no bearing on this dispute.

[18] Agreement § 15.11(a) ("Subject to the limitations set forth in the Agreement, this Agreement shall not be amended without the written consent of not less than 66 2/3% of the Percentage Interests of the Preferred Interestholders, . . ."); *see also id.* § 8.2(j) (same voting provision applied to Major Matters Approval, such as amendment of the Agreement).

5

8.7 <u>Indemnification</u>. . . . except that no Member, Manager or employee shall be entitled to be indemnified in respect of any loss, damage or claim incurred by reason of such Person's (i) gross negligence or willful misconduct with respect to such acts or omissions, *or ii) breach of any agreement, express or implied, entered into by such Person with one or more outside parties prior to such Person's association with the Company or following such association but outside of such Person's official capacity and without the Company's express agreement to indemnify hereunder;* provided, however, that any indemnity under this Section 8.7 shall be provided out of and to the extent of Company assets only, and no Member shall have personal liability on account thereof. *"Outside parties" for purposes of this Section 8.7 shall include, without limitation, prior employers or other business associates unaffiliated with the Company.*[19]

In general, through this revision, SRIC LLC excluded from the scope of its indemnification obligation claims based on actions by its employees that may have breached a contract between the employee and a third party that predated employment.

Branin first discussed indemnification for the New York Action expenses with Defendants' in-house counsel in December 2004.[20] Counsel rejected Branin's multiple requests for indemnification.[21] Branin eventually filed this action to recover his legal expenses from the New York Action. Relying upon the Second Amendment, Defendants seek to avoid the indemnification obligation because Bessemer sued Branin for breach of Branin's agreement (entered into before he

---

[19] DOB, Ex. 5 (emphasis added) (Second Amendment to Amended and Restated Limited Liability Company Operating Agreement (the "Second Amendment")).
[20] Compl. ¶¶ 13, 74.
[21] *Id.* ¶¶ 74-77.

6

worked for SRIC LLC) with Bessemer (a third party).[22] Defendants also deny Branin's allegations that he acted in good faith and in a manner he reasonably believed to be within the scope of his employment with SRIC LLC.[23]

## II. ANALYSIS

Two primary issues are before the Court. First, when does an indemnification cause of action accrue and will it accrue irrevocably even if the indemnitee is on notice that the agreement which provides for indemnification may be modified? The answer to these questions determines which version of the operating agreement controls and is critical because the First Amendment contains expansive language under which Branin appears to be entitled to indemnification. The Second Amendment reflects modifications apparently intended to carve out the sort of claims for which Branin seeks indemnification and thus likely would preclude his recovery if it controls.[24] Second, the related question is: If Branin had a viable cause of action for indemnification after Bessemer sued him, could Defendants defeat it by later amending their indemnification agreement?

---

[22] Branin does not argue that SRIC LLC expressly agreed to indemnify him against Bessemer's claims.

[23] Defs.' Answer and Affirmative Defenses to Verified Am. Compl. for Indemnification ("Defs.' Answer") ¶¶ 64-65, 67, 84.

[24] Nonetheless, Branin gamely argues that even this version would grant him a right to indemnification.

7

Defendants moved for judgment on the pleadings because, they argue, the Second Amendment controls and precludes Branin's right to recover.[25]  Branin also moved for judgment on the pleadings, arguing that the indemnification provision under the First Amendment should control, because SRIC LLC's obligation to indemnify him accrued upon the filing of the New York Action.

If the Court concludes that Branin has indemnification rights to pursue under the First or Second Amendment, it must then turn to the more familiar disputes associated with indemnification, such as whether Branin was sued because of conduct taken on behalf of SRIC LLC and whether such conduct was in good faith and within the scope of his employment.

A. *The Legal Standards*

The Court may, under Court of Chancery Rule 12(c), grant judgment on the pleadings if the "pleadings fail to reveal the existence of any disputed material fact and where the movant is entitled to judgment as a matter of law."[26]  When assessing a motion for judgment on the pleadings, the Court accepts as true the well-pled factual allegations of the non-moving party and draws all inferences

---

[25] The Court need not consider Counts II and III, which related to SRIC, Inc., because they were dismissed.

[26] *W. Coast Mgmt. & Capital, LLC v. Carrier Access Corp.*, 914 A.2d 636, 641 (Del. Ch. 2006) (citing *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993)); *see* Ct. Ch. R. 12(c).

from them in the light most favorable to that party.[27] The Court is not, however, required to accept conclusory allegations which are unsupported by specific facts.[28]

Because contract interpretation is a matter of law, if the contract is unambiguous, its meaning may be determined on a motion for judgment on the pleadings.[29] A court will look to the terms of the contract as the best indication of the parties' shared intent and will ascribe those common and ordinary meanings which an objectively reasonable third-party observer would.[30] A contract is ambiguous only if its language is susceptible to two or more reasonable interpretations.[31]

## B. *Does Branin Have a Right to Indemnification Under the First Amendment and Was It Superseded by the Second Amendment?*

Limited liability companies are tersely and expansively authorized by statute to provide indemnification:

> Subject to such standards and restrictions, if any, as are set forth in its limited liability company agreement, a limited liability company may, and shall have the power to, indemnify and hold harmless any member or manager or other person from and against any and all claims and demands whatsoever.[32]

---

[27] *Rag Am. Coal Co. v. AEI Res., Inc.*, 1999 WL 1261376, at *1 (Del. Ch. Dec. 7, 1999) (citing *Desert Equities*, 624 A.2d at 1205).

[28] *Great-W. Investors L.P. v. Thomas H. Lee P'rs, L.P.*, 2011 WL 284992 (Del. Ch. Jan. 14, 2011) (citing *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006)).

[29] *Lillis v. AT&T Corp.*, 904 A.2d 325, 329-30 (Del. Ch. 2006).

[30] *CorVel Enter. Comp, Inc. v. Schaffer*, 2010 WL 2091212, at *1 (Del. Ch. May 19, 2010).

[31] *Id.*

[32] 6 *Del. C.* § 18-108.

The parties to a limited liability company agreement have significant freedom to define the rights and duties related to the entity.[33] No criteria are established by statute to govern the indemnification that limited liability companies may offer. For example, indemnification is not limited to members or managers; instead, it may also be made available to "other person[s]."[34]

When Branin was hired by SRIC LLC, he became "entitled to indemnification" from SRIC LLC "for any . . . claim by reason of any act . . . performed by [him] in good faith on behalf of [SRIC LLC] and, as applicable, in a manner reasonably believed to be within the scope of the authority conferred on it by the Agreement. . . ."[35] His indemnification rights do not depend upon being "successful on the merits or otherwise in defense of any action . . . ."[36] Instead, the Agreement requires that Branin, as a potential indemnitee, acted in good faith and within the scope of his authority.[37] Bessemer brought its claim against Branin, evidenced by filing the New York Action, in November 2002. If Bessemer's claim was based on Branin's good faith action, taken on behalf of SRIC LLC, and if

---

[33] 6 *Del. C.* § 18-1101(b) ("It is the policy of [the Limited Liability Company Act] to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements."); *see, e.g.*, *Kuroda v. SPJS Hldgs., LLC*, 971 A.2d 872, 880 (Del. Ch. 2009) ( "[T]he parties have broad discretion to use an LLC agreement to define the character of the company and the rights and obligations of its members.").

[34] 6 *Del. C.* § 18-108.

[35] First Amendment § 8.7.

[36] *See, e.g.*, 8 *Del. C.* § 145(c).

[37] *See, e.g.*, *Costantini v Swiss Farm Stores Acquisition LLC*, 2013 WL 4758228, at *2 (Del. Ch. Sept. 5, 2013) (reviewing an operating agreement that conditioned indemnification on the good faith actions of the indemnitee).

Branin reasonably believed those acts to be within the scope of his authority, he then became "entitled to indemnification" for the claim.[38]

SRIC LLC's indemnification obligation, under the terms of the First Amendment, covered the "claim." The claim which Bessemer asserted against Branin, based on the *Mohawk* Doctrine, would require ten years of litigation for its resolution. The claim did not change in substance over time and, with the filing of the claim (*i.e.*, the New York Action), Branin became "entitled to indemnification." Correspondingly, SRIC LLC became liable to Branin to indemnify him against that claim. Branin, thus, had a right, in the nature of contract, to indemnification by SRIC LLC for the Bessemer claim and the expenses that he would reasonably incur in defending against it.[39]

SRIC LLC, however, restated the First Amendment in February 2003 in a manner that, if applicable, would have denied Branin any right to indemnification

---

[38] The drafters of the First Amendment used "shall be entitled" and thereby indicated their intention that the indemnification obligation of SRIC LLC was mandatory. *See Stockman v. Heartland Indus. P'rs, L.P.*, 2009 WL 2096213, at *6 (Del. Ch. July 14, 2009) ("[T]he plain meaning of 'shall be advanced' is that advancement is mandatory. To give the General Partner unfettered discretion to deny an advancement request would, in essence, convert the Advancement Provision to a permissive rather than a mandatory term, in contravention of its plain language.").

[39] In a different context, indemnification may depend upon the indemnitee's final success (or otherwise prevailing) on the claim. *See, e.g.*, 8 *Del. C.* § 145(c); *LaPoint v. AmerisourceBergen Corp.*, 970 A.2d 185, 198 (Del. 2009) ("Indemnification claims do not accrue until the underlying claim is finally resolved."). In this instance, Branin did not prevail on the Bessemer claim for roughly ten years. Because SRIC LLC did not base its indemnification duties upon the indemnitee's prevailing, there is no argument that its liability to indemnify the claim was somehow delayed until Branin ultimately prevailed. Under the terms of the First Amendment, SRIC LLC's liability to indemnify matured in late 2002.

for the Bessemer claim because it arose under a contract which he had with a third party before he began working for SRIC LLC. The First Amendment was subject to revision and modification, and the Defendants argue that the changes accomplished in February 2003 with the adoption of the Second Amendment preclude any indemnification award to Branin. There is no question that SRIC LLC could amend its operating agreement and it duly did so when it adopted the Second Amendment.[40] A reasonable reading of the pertinent part of the Second Amendment is that SRIC LLC was seeking to avoid liability to Branin for the claim brought against him by Bessemer. The question, thus, becomes whether SRIC LLC was successful. The First Amendment offers no other guidance on how to deal with an indemnification claim that arose under it but might be precluded by subsequent amendment.

A brief consideration of the policies justifying indemnification may be helpful. Entities indemnify employees (or officers or directors) in an effort to encourage them to work for or to serve the entity. An employee will be more willing to work for an entity if he does not expose his personal wealth to the risks

---

[40] Agreement § 15.11(a) ("Subject to the limitations set forth in this Agreement, this Agreement shall not be amended without the written consent of not less than 66 2/3% of the Percentage Interests of the Preferred Interestholders, so long as any Preferred Interest shall be outstanding, and the holders of not less than 66 2/3% of the Percentage Interests of the Common Interestholders."). Indeed, the Agreement, with its own definition, *id.* Art. I, recognizes that "it may be further amended, restated or supplemented from time to time as herein provided."

associated with that employment; thus, entities, such as SRIC LLC, offer indemnification to enhance their ability to hire the individuals they want.

In this instance, Branin discussed with SRIC LLC's President and CEO the potential of bringing his former clients from Bessemer to SRIC LLC and the risks, including application of the *Mohawk* Doctrine, that might flow from the acquisition of those clients. As anticipated, SRIC LLC obtained the benefit of those former clients attracted by Branin. Branin, of course, benefited from the movement of his former clients, but it was not for his exclusive benefit. Before SRIC LLC adopted the Second Amendment, most, if not all, of the movement of Branin's former clients to SRIC LLC had occurred. Thus, in light of the benefits accruing to SRIC LLC and the reasons for adopting indemnification provisions generally, indemnifying Branin against the Bessemer claim is consistent with the policy behind the terms of the First Amendment regarding indemnification.

Additionally, despite the language allowing a modification of the Agreement, Branin, at the time of the conduct that gave rise to the Bessemer claim, reasonably anticipated that he would have the protection of SRIC LLC's indemnification obligation. When Bessemer filed the New York Action, SRIC

LLC's liability to Branin had matured under the terms that it had chosen for its operating agreement in effect at that time.[41]

Moreover, SRIC LLC's operating agreement provided indemnification "[t]o the full extent permitted by applicable law."[42] Several cases provide some general guidance, but none delivers the answer.[43] In part, to understand the contours of Delaware's indemnification law, and in part to address specific arguments of the parties, the Court reviews a few relevant cases. In *Salaman v. National Media Corp.*,[44] a company validly repealed its indemnification bylaw in 1992. The plaintiff had been sued (defined as an "Indemnified Event") in 1990. The Court upheld the plaintiff's entitlement to indemnification:

> Salaman's right to advancement and indemnification is a vested contract right which cannot be unilaterally terminated. Once an Indemnified Event occurred, the contract rights vested. The Event

---

[41] Defendants also contend that, because the Second Amendment deleted the indemnification provision of the First Amendment and replaced it in its entirety, Branin has no right to indemnification. DOB at 28. The Second Amendment does not purport to alter their existing liabilities under the First Amendment. Thus, until the adoption of the Second Amendment, the First Amendment's indemnification provision was in force and those obligations due under the provision were not canceled because of a later amendment.

[42] Both the First Amendment and the Second Amendment recite the "[t]o the full extent permitted by applicable law" language.

[43] Case law must be used cautiously in searching for the intent of the parties for an indemnification provision in a limited liability company agreement. The parties are largely free to draft an indemnification provision as they see fit. Yet, when the agreement is silent on a particular issue, well-settled principles of indemnification law drawn from 8 *Del. C.* § 145 may be helpful in the analysis because sophisticated parties can safely be presumed to be familiar with the policies and precepts embedded generally in the corporate law. Nevertheless, the parties' freedom to contract must be respected.

[44] 1992 WL 808095 (Del. Super. Oct. 8, 1992).

[the litigation] triggered [the company's] obligations under the bylaws.[45]

Although the facts of *Salaman* are comparable to the facts upon which Branin's claim is based, the corporate indemnification rights at issue in *Salaman* do not necessarily or automatically resolve Branin's entitlement to indemnification under a limited liability company agreement.

*Kidsco Inc. v. Dinsmore*[46] found that the board of directors had not breached shareholders' contract rights in bylaws by amending the bylaws. The time for calling a meeting had been extended from thirty-five days to sixty days, after a shareholder had given thirty-five days notice, and the Court concluded that because shareholders were on notice that the bylaws could be amended at any time by the board of directors, they had no vested rights under the bylaws.[47] The Defendants suggest that the right to indemnification and the right to call a meeting upon certain advance notice both can be changed at any time, if the right to make a change has been preserved in the operative documents, and thus there is no reasonable expectation that the rights at issue would ever vest.

---

[45] *Id.* at *6. The court cited *8 W. Fletcher Cyclopedia of the Law of Private Corporations* § 4177.10 at 711 for the following proposition: "The power to alter, amend or repeal bylaws cannot confer authority to make an amendment which amounts to the destruction or impairment of vested or contract rights." *Id.*

[46] 674 A.2d 483 (Del. Ch. 1995).

[47] *Id.* at 492 ("[W]here a corporation's by-laws put all on notice that the by-laws may be amended at any time, no vested rights can arise that would contractually prohibit an amendment.").

General corporate governance standards and an individual's right to be reimbursed certain expenses are fundamentally different because one affects all shareholders while the other affects only a limited subset of interested persons. The Court acknowledged that 8 *Del. C.* § 394 prohibited a statutory charter amendment from impairing "any remedy . . . against any corporation or its officers for any *liability* which shall have been previously incurred."[48] The Court recognized that a different result would be justified in the "context of a director['s] individual indemnification rights that became perfected before the board amended its by-laws to eliminate those rights."[49] Nothing in Branin's claim prohibited SRIC LLC from amending the Agreement on a prospective basis. The question is whether the Agreement could have been amended to eliminate an indemnification provision under which liability had "been previously incurred." Again, *Kidsco* involved a corporation and not a limited liability company, and thus its applicability may be limited.

In *Schoon v. Troy Corporation*,[50] amendments to a corporation's bylaws removing former directors from the class of persons entitled to advancement were enforced. The Court, however, emphasized that the former directors' advancements rights had not been triggered before the amendments. Thus, under

---

[48] *Id.* (emphasis in original) (quoting 3 Folk, Ward & Welch, *Folk on the Delaware General Corporation Law*, § 394.2.2. (1992)).
[49] *Id.* at 492 n.6.
[50] 948 A.2d 1157 (Del. Ch. 2008).

the governing bylaws, the ability to deny indemnification by amending the bylaws was confirmed for those instances in which the right to advancement had not been "triggered." Consistent with *Schoon*, SRIC LLC was free to amend its operating agreement in 2003 to preclude indemnification claims that had not yet matured. That authority does not generally inform the question of whether it could have eliminated those rights if they had already ripened.

In *Bernstein v. TractManager, Inc.*,[51] the Court was called upon to determine whether a corporation's bylaws providing for mandatory advancement should be read to apply to the former manager of the limited liability company (which had converted into the corporation), even though the limited liability company's operating agreement did not provide for advancement.[52] The Court concluded "that the right to indemnification or advancement for claims that arose during the life of the LLC continues to be governed by the terms of the old operating

---

[51] 953 A.2d 1003 (Del. Ch. 2007). Although Defendants seem to have abandoned the argument, in their opening brief they assert that *Bernstein* actually supports their contention through a parenthetical with the following claim: "indemnification demand to post-conversion corporation for actions that arose during life of LLC was governed by LLC's amended operating agreement, including amended indemnificaiton provision, in effect at time of conversion." DOB at 30 (citing *Bernstein*, 953 A.2d at 1008). However, *Bernstein*'s analysis was not concerned with which version of the operating agreement was effective. The opinion explains that neither version of the limited liability company's operating agreement contained a mandatory advancement provision and thus, under either version, Bernstein had no right to advancement. The issues before the *Bernstein* court did not turn on which version of the limited liability company's operating agreement controlled and, as this Court reads *Bernstein*, the question was not resolved. *See Bernstein*, 953 A.2d at 1008, 1013.
[52] It did provide for indemnification.

agreement."[53] The Court recognized that rights under the operating agreement might be enforced against the corporation following conversion, but that the corporation's bylaws could not be extended back to address conduct while the enterprise was organized as a limited liability company. In sum, the Court sought to enforce rights provided under the limited liability company agreement by referring to the time period when the limited liability company agreement was the governing document.

The Court concludes that the operating agreement's commitment to indemnification to "the full extent of the law" may create an enforceable right to indemnification that vests in accordance with the terms of the agreement and thereafter may not be rescinded by amendment of the operating agreement.[54] Although one must look to the terms of the agreement to find the precise contours, the Defendants' approach does not explain when rights for which liability has been established may be compromised. For example, if the amendment process here

---

[53] *Id.* at 1005.

[54] This is consistent with the broad discretion accorded drafters of indemnification provisions for limited liability company agreements by 6 *Del. C.* § 18-108. Defendants argue that to the "full extent permitted" by Delaware law means to the full extent permitted by the Delaware Limited Liability Company Act. Defs.' Reply Br. in Supp. of Defs.' Mot. for J. on the Pleadings and Answering Br. in Opp'n to Pl.'s Cross-Mot. for J. on the Pleadings ("DRB") at 23-24 (citing *Senior Tour Players 207 Mgmt. Co. LLC v. Golftown 207 Hldg. Co. LLC*, 2004 WL 550743, at *2-3 (Del. Ch. Mar. 10, 2004)). The implication of Defendants' assertion is that the full extent of the law permitted by Delaware's Limited Liability Company Act is limited and would prevent a company from creating an indemnification or advancement scheme which mirrors that permitted under Delaware's corporate law in a manner which reproduces the results of *Kidsco* or *Salaman*. Defendants' approach fails because it does not account for the broad powers granted to drafters of operating agreements.

permits the evisceration of accrued indemnification liability, would it also permit the reduction or elimination of other rights under the agreement, such as the right to payment of earned distributions?

The Court's interpretation of the Agreement is consistent with the case law which has been reviewed, which generally protects indemnitees and looks to the operating agreement in place when the events giving rise to the claim accrued or when the lawsuit involving the claim was filed. More importantly, the Court's conclusion is the result of the plain reading of the First Amendment. Branin has established a right to pursue a claim for indemnification under the First Amendment. If he satisfies the other substantive requirements of the indemnification provision, SRIC LLC's liability for the claim (the cost of defending against Bessemer in the New York Action) was fixed before the Second Amendment. Additionally, although SRIC LLC's liability for future indemnification claims was limited by the Second Amendment, that agreement did not purport to modify or eliminate (and did not modify or eliminate) any liability that already existed under the Agreement.[55]

---

[55] Although the parties have not focused on this, one wonders if the Agreement could be read to allow only for indemnification of costs incurred before the Second Amendment. In other words, costs incurred by Branin after adoption of the Second Amendment would not be subject to indemnification. The First Amendment, however, provides for indemnification for a claim. The Bessemer claim arose (and was asserted in the New York Action and resulted in defense costs for Branin) during the era of the First Amendment. Thus, Branin is entitled to indemnification with respect to that claim for however long costs were reasonably incurred in defending against

19

Defendants also argue that because Branin is an at-will employee, there is nothing inequitable about having an indemnification provision that does not grant him a vested right.[56] Whether inequitable or not, as discussed above, the plain language of the First Amendment which permits indemnification to the full extent of Delaware law granted Branin a right to indemnification and liability matured under that provision while it was in effect. The Court thus concludes that Branin's right to indemnification which accrued under the First Amendment was not unilaterally rescinded because of the Second Amendment.[57]

## C. *Was Branin Sued in His Personal Capacity and Did He Act in Bad Faith or Exceed the Scope of His Authority?*

Defendants argue that the pleadings in the New York Action indicate that Branin was sued in his personal capacity or by reason of the fact of his employment with Bessemer, rather than his employment with SRIC LLC.[58] The Court disagrees. Our Supreme Court has stated that "if there is a nexus or causal connection between *any of the underlying proceedings . . .* and one's official

---

the claim, assuming the other requirements necessary to establish the right to indemnification are satisfied.

[56] DRB at 9.

[57] Many of Defendants' arguments are premised on Defendants' theory that Branin's right to indemnification was exclusively based on the Second Amendment. Because the Court concludes otherwise, many of Defendants' arguments are not applicable and are therefore not considered.

[58] Defendants also question whether Branin may have limited his complaint to a claim for indemnification under the Second Amendment. *See* DRB at 5. Branin's Complaint speaks of both the First Amendment and the Second Amendment, as well as a now-dismissed claim against a corporate successor. Although the Complaint may have caused some confusion, it is neither fair nor appropriate to read it as limited to rights under the Second Amendment to the exclusion of rights under the First Amendment.

capacity, those proceedings are 'by reason of the fact' that one was a corporate officer."[59] Here, Branin was an employee of SRIC LLC, and thus the question is whether a nexus or causal connection existed between any of the underlying proceedings and Branin's capacity as an employee of SRIC LLC.

Such a nexus or causal connection existed. Defendants are correct that SRIC LLC was never sued by Bessemer and that Branin was the beneficiary of the sale of Brundage's goodwill to Bessemer. However, although the initial District Court decision found that Branin's actions did not cause 29 of the 30 clients "to transfer their accounts to Stein Roe,"[60] Branin, as an employee, created tangible benefits for SRIC LLC because of his contacts and client accounts at Bessemer. Furthermore, the question certified by the Second Circuit to the New York Court of Appeals was "[w]hat degree of participation in a new employer's solicitation of a former employer's client by a voluntary seller of that client's goodwill

---

[59] *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 214 (Del. 2005) (emphasis added). Defendants argue that certain Chancery Court cases which focus on the claims pled prevent this Court from considering anything from a proceeding for which indemnification is sought beyond a plaintiff's complaint. DRB at 13-17. The Court disagrees as the Supreme Court's broad pronouncement requiring a "connection between *any of the underlying proceedings*," discussed above, retains vitality. Furthermore, Defendants mischaracterize the primary case they use to support this point by arguing that the case only allows inquiry into the plaintiff's complaint. The court stated that "this court looks to substance as well as form" and thereby emphasized the range of a court's consideration. *See Brown v. LiveOps, Inc.*, 903 A.2d 324, 329 (Del. Ch. 2006).

[60] Compl. ¶ 50 (quoting *Bessemer Trust Co., N.A. v. Branin*, 427 F.Supp.2d 386, 397 (S.D.N.Y. 2006), *vacated in part*, 675 F.3d 130 (2d Cir. 2012)).

constitutes improper solicitation?"[61]  This language demonstrates a nexus between the New York Action and Branin's status as an employee of SRIC LLC.

Defendants also do not dispute Branin's allegations that he explained to Rankin the *Mohawk* Doctrine's possible impact on Branin's ability to bring his Bessemer clients to SRIC LLC[62] and Rankin testified that part of the reasoning behind hiring Branin was to use him as "the vehicle by which [his former clients'] business was to be . . . transferred to [SRIC LLC]."[63]  Thus, SRIC LLC should not have been surprised that Branin might be sued under the *Mohawk* Doctrine, because it hired Branin in part to secure his former clients and their accounts.  It is disingenuous for the Defendants now to assert that Branin was sued solely in a personal capacity when SRIC LLC intended to capture the benefits of his client accounts and in fact did benefit from those accounts during his employment.[64]

Nonetheless, Branin's motion for judgment on the pleadings cannot be granted.  His pleadings assert repeatedly that he acted in good faith and in a manner he reasonably believed to be within the scope of his authority.[65]  However,

---

[61] *Id.* ¶ 54 (quoting *Bessemer Trust Co., N.A. v. Branin*, 618 F.3d 76, 94 (2d Cir. 2010), *certified question accepted*, 15 N.Y.3d 836, 935 N.E.2d 802 (2010), *and certified question answered*, 16 N.Y.3d 549, 949 N.E.2d 462 (2011)).

[62] *Id.* ¶ 30; Defs.' Answer ¶ 30 (averring, however, that the governance or effect of New York law sets forth a legal conclusion which does not require a responsive pleading).

[63] Compl. ¶ 46.

[64] *Id.* ¶ 79 (alleging that Defendants have received over $14 million in revenue since Branin joined SRIC LLC in 2002).

[65] *Id.* ¶¶ 64-65, 67, 84.

Defendants' Answer disputes these assertions and creates a factual issue which the Court cannot decide at this time.[66]

Thus, although Branin was sued "by reason of the fact" of his employment with SRIC LLC, a disputed issue of fact remains concerning whether Branin acted in good faith or in a manner reasonably believed to be within the scope of his authority. The Court therefore denies Branin's motion for judgment on the pleadings.

D. *Was Branin Not an Intended Beneficiary of the Indemnification Provision or Does He Otherwise Lack Standing to Sue?*

Defendants offer two additional arguments which require only brief responses. They contend that Branin's claim cannot be resolved on the motion for judgment on the pleadings because "the key to third-party standing in contract law is intent to benefit the third party."[67] Defendants ignore that the intent of a contract can be determined from its plain meaning if it is unambiguous. Here, Section 8.7 of the First Amendment plainly announces its intent to treat employees of SRIC LLC as intended beneficiaries and thus no factual investigation is necessary on this issue.

---

[66] *See supra* note 23.

[67] DRB at 12 (quoting *Amirsaleh v. Bd. of Trade of City of New York, Inc.*, 2008 WL 4182998, at *4 (Del. Ch. Sept. 11, 2008)).

Finally, Defendants argue that Branin has no standing "to attack or undo the February 2003 Amendment."[68] First, the Court is not "undoing" the Second Amendment which came too late to afford Defendants the benefits they now claim. Branin simply seeks to assert those rights, which the Second Amendment did not rescind, that he is owed under the First Amendment.[69] Second, his status as a third party beneficiary grants him standing to assert this challenge.[70]

### III. CONCLUSION

For the above reasons, the plain meaning of SRIC LLC's operating agreement grants Branin a right to indemnification for the New York Action. His right did not "fail to vest" and was not otherwise rescinded by the second amendment to the company's operating agreement. However, a material factual issue remains concerning whether Branin acted in good faith on behalf of the company and in a manner reasonably believed to be within the scope of his

---

[68] *Id.* at 10.

[69] Defendants also appear to argue that Branin cannot be considered a third-party beneficiary of the operating agreement because of boilerplate in the amended operating agreement. Agreement § 15.3 ("No other party shall be deemed a third-party beneficiary of this Agreement."). Defendants ignore Section 8.7, as amended, which clearly sets forth a right in SRIC LLC's employees which would be rendered meaningless if the blanket statement Defendants quote applied. Rendering a provision meaningless is a result that should be avoided, if possible, in construing a contract. *See, e.g.*, *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 287 (Del. 2001) ("Contracts are to be interpreted in a way that does not render any provisions illusory or meaningless." (citations omitted)).

[70] *See Browne v. Robb*, 583 A.2d 949, 954 (Del. 1990).

authority.  The Court thus denies both parties' motions for judgment on the pleadings.[71]

**IT IS SO ORDERED.**

/s/ *John W. Noble*
Vice Chancellor

---

[71] In Count IV, Branin seeks to recover his attorneys' fees and expenses incurred in pursuing this action.  Resolution of that dispute must await final resolution of Branin's indemnification claim.