EFiled: Oct 05 2015 04:42PM EDT
Transaction ID 57964883
Case No. 10436-VCN

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

VICTORIA A. SHAEV, On Behalf of Herself :
and All Other Similarly Situated Stockholders, :
and Derivatively for the Benefit of and on :
Behalf of Nominal Defendant FREEPORT- :
MCMORAN INC., :
 :
    Plaintiff, :
 :
   v. : **C.A. No. 10436-VCN**
 :
RICHARD C. ADKERSON, ROBERT J. :
ALLISON, JR., ROBERT A. DAY, :
GERALD J. FORD, H. DEVON GRAHAM, JR., :
LYDIA H. KENNARD, JAMES C. FLORES, :
ALAN R. BUCKWALTER, III, THOMAS A. :
FRY, III, CHARLES C. KRULAK, BOBBY LEE :
LACKEY, JON C. MADONNA, DUSTAN E. :
MCCOY, JAMES R. MOFFETT, STEPHEN H. :
SIEGELE, FRANCES FRAGOS TOWNSEND :
and FREEPORT-MCMORAN INC., :
 :
    Defendants. :

## MEMORANDUM OPINION

Date Submitted:  June 18, 2015
Date Decided:  October 5, 2015

Peter B. Andrews, Esquire and Craig J. Springer, Esquire of Andrews & Springer, LLC, Wilmington, Delaware; Alexander Arnold Gershon, Esquire and Michael A. Toomey, Esquire of Barrack, Rodos & Bacine, New York, New York; and Daniel E. Bacine, Esquire of Barrack, Rodos & Bacine, Philadelphia, Pennsylvania, Attorneys for Plaintiff.

William M. Lafferty, Esquire, Megan W. Cascio, Esquire, Kevin M. Coen, Esquire, and Lauren K. Neal, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware, and William Savitt, Esquire, Andrew J.H. Cheung, Esquire, Adam S. Hobson, Esquire, and Nicholas Walter, Esquire of Wachtell, Lipton, Rosen & Katz, New York, New York, Attorneys for Defendants.

NOBLE, Vice Chancellor

# I.  INTRODUCTION

Plaintiff Victoria Shaev ("Shaev" or "Plaintiff") brought this direct and derivative action on behalf of herself and other similarly situated stockholders, and derivatively on behalf of Nominal Defendant Freeport-McMoRan, Inc. ("Freeport" or the "Company").  Plaintiff requests that the Court declare void, rescind, and terminate the Freeport board's grant of one million restricted stock units ("RSUs") to Defendant Richard Adkerson ("Adkerson"), declare void the Freeport stockholders' 2014 director election and approval of the say-on-pay proposal, require an equitable accounting, with disgorgement, to compensate Freeport for the losses sustained by the alleged conduct, award monetary relief to compensate Freeport for the grant of the RSUs to Adkerson, and award Plaintiff her legal expenses.  The Court now addresses the Freeport board of directors' and Freeport's (together the "Defendants") motion to dismiss under Court of Chancery Rules 12(b)(6) and 23.1.

# II.  BACKGROUND[1]

Freeport is a diversified natural resources company incorporated in Delaware.[2]  The Company's stock trades on the New York Stock Exchange, and,

---

[1] The factual background is based on allegations in the Verified Stockholder's Class and Derivative Action Complaint ("Complaint" or "Compl.") and on exhibits integral to or incorporated into the Complaint. *In re Gardner Denver, Inc.*, 2014 WL 715705, at \*2 (Del. Ch. Feb. 21, 2014).

[2] Compl. ¶ 6.

as of February 14, 2014, more than one billion shares of common stock were issued and outstanding.[3]  Shaev has continuously owned Freeport stock since March 2007.[4]

In May and June 2013, the Company, then a mining company named Freeport-McMoran Copper & Gold Inc. (also referred to as the "Company" or "Freeport") acquired Plains Exploration & Production Co. ("PXP") and McMoran Exploration Co. ("MMR").[5]  Freeport stockholders challenged the acquisitions, alleging that the Company's board of directors had breached its fiduciary duties (the "Related Action"),[6] and eventually settled.[7]  The settlement purported to release all claims but, when Plaintiff objected to the settlement to the extent that it released her claims, Defendants agreed to "carve out that claim from the release."[8] Therefore, this action is the sole remaining challenge arising from the facts upon which the Related Action was based.

---

[3] *Id.*

[4] *Id.* ¶ 5.

[5] *Id.* ¶¶ 6, 24.

[6] Verified Derivative Action Complaint ¶ 1, *In re Freeport-McMoran Copper & Gold Inc. Deriv. Litig.*, C.A. No. 8145-VCN (Dec. 21, 2012).

[7] Tr. of Settlement Hr'g at 4, *In re Freeport-McMoran Copper & Gold Inc. Deriv. Litig.*, C.A. No. 8145-VCN (Apr. 20, 2015).

[8] *Id.* at 17; Defs.' Reply Br. in Supp. of their Mot. to Dismiss the Verified S'holder's Class and Deriv. Action Compl. ("Defs.' Reply Br.") 25 n.8 ("[T]o avoid needless litigation of these same claims in the context of a settlement objection, defendants in this action will not contend that the settlement of [the Related Action] releases Shaev's claims in this case.").

2

Adkerson was, since December 2003 and until the acquisitions, the sole CEO of Freeport, and has been Freeport's president since January 2008.[9] Defendant James Flores ("Flores") was the chairman, CEO, and president of PXP when it was acquired by Freeport.[10] As part of the acquisition of PXP, the Freeport board limited Adkerson's authority as CEO to the mining business,[11] installed Flores as CEO of the oil and gas business,[12] and adopted certain bylaw amendments subjecting both CEOs' authority to that of Moffett, the board chairman.[13] At a December 3, 2012, meeting conducted by the special committee charged with evaluating the MMR and PXP acquisitions, Adkerson agreed to the limitations on the scope of his authority.[14] Adkerson also voted at an April 17, 2013, special board meeting in favor of adopting the amended bylaws.[15] While the amendments for the first time subjected Adkerson's authority to that of the

---

[9] Compl. ¶ 8.

[10] *Id.* ¶ 9.

[11] *Id.* ¶ 25.

[12] *Id.* Additionally, Adkerson and Flores would become vice chairmen of Freeport, and Defendant James Moffett ("Moffett") would remain as chairman of Freeport's board. *Id.*

[13] *Id.* ¶ 11. While the Complaint mentions only that the CEO of the oil and gas business (Flores) must report to the chairman (Moffett), the bylaw amendments quoted in the Complaint indicate that, contrary to the CEO's independence prior to the amendments, the CEO (Adkerson) now must also report to the chairman. *Id.* (quoting the previous and amended bylaws enumerating the CEO's authority, including the phrase "and [shall have] such other duties and responsibilities as may be determined by the Chairman of the Board," which appeared only in the amended version).

[14] *Id.* ¶ 25.

[15] *Id.* ¶¶ 21-22. The vote was unanimous. *Id.*

chairman, Moffett assured Adkerson, prior to the vote, that "the changes to the by-laws would have no impact on Mr. Adkerson's rights under his employment agreement."[16]

After consummation of the acquisitions, the Freeport compensation committee became concerned that these governance alterations might have triggered a clause in Adkerson's 2008 employment agreement (the "Employment Agreement") allowing him to terminate his employment for "good reason," and, according to the Freeport board, receive a $46 million severance package (the "Good Reason" provision).[17]  The Employment Agreement defined "Good Reason" as including "any . . . action that results in a diminution in [Adkerson's] position, authority, duties or responsibilities,"[18] and provided that "[a]ny

---

[16] Transmittal Aff. of Lauren K. Neal in Supp. Of Defs.' Br. in Supp. of their Mot. to Dismiss the Verified S'holder's Class and Deriv. Action Compl. ("Neal Aff.") Ex. 5 at 2 (minutes from the April 17, 2013 board meeting).  Plaintiff, at page 12 of her Answering Brief, acknowledges that Adkerson made this statement.

[17] Compl. ¶ 17.  The Employment Agreement expired on January 1, 2012, but would automatically renew for additional one year terms "unless not later than August 1 of the immediately preceding year," the board's compensation committee provides written notice "that it does not wish to extend th[e] agreement." Neal Aff. Ex. 1 ("Employment Agmt.") at Art. I § 2.  The Employment Agreement provided that, if Adkerson terminated with Good Reason or Freeport terminated without cause, Freeport would be required to pay Adkerson "in cash an amount equal to three times the sum of (i) the Executive's Base Salary in effect at the Termination Date and (ii) average of the Bonuses paid to the Executive for the immediately preceding three Fiscal Years." *Id.* at Art. IV § 4(b).

[18] Employment Agmt. Art. III § 4(b).

4

determination of 'Good Reason' made by [Adkerson] in good faith and based upon his reasonable belief and understanding shall be conclusive."[19]

To that end, the compensation committee retained compensation consultant John D. England ("England"), a managing director of Pay Governance LLC, to assess the credibility of the potential claim.[20]  During compensation committee meetings on October 14 and 28, 2013, England reported that the governance changes may have triggered the Good Reason provision in the Employment Agreement.[21]  The minutes from the October 28 meeting reflect Adkerson "indicat[ing] that from his point of view, this matter needs to be addressed prior to year-end 2013."[22]

On October 29, 2014, the full board met in executive session and, with Adkerson and Moffett having left the room, Graham reported on the October 28 meeting of the compensation committee.[23]  Freeport's board reconvened on December 10, 2013 and agreed, outside the presence of Adkerson, Flores, and Moffett, to grant Adkerson "one million RSUs to resolve the asserted good reason

---

[19] *Id.* Art. III § 4.
[20] Compl. ¶ 26.
[21] *Id.* The October 14 meeting was attended by the following directors: Defendants Allison, Graham, Krulak, Lackey, and Ford. *Id.* The October 28 meeting was attended by Defendants Allison, Graham, Kulak, Lackey, Adkerson, Flores, Ford, and Moffett. *Id.*
[22] Neal Aff. Ex. 6 at 3 (minutes from the October 28 compensation committee meeting).
[23] Compl. ¶ 26.

claim under the 2008 [Employment] Agreement" and retain Adkerson as an officer of Freeport.[24] The RSUs had a grant date fair value of $35,190,000, though due to an intervening dividend payment the Company recorded a $37 million accounting charge in 2013.[25] The RSU grant, the Freeport board rationalized, retained Adkerson as an officer, compromised the Good Reason claim, reduced the potential payout from $46 million to $35 million, and, though the Company's income statement took an immediate charge, deferred any cash outlay until no earlier than 6 months after Adkerson retires.[26] Plaintiff subsequently filed this action on December 8, 2014, challenging the validity of the RSU grant to Adkerson and seeking the relief enumerated above.

## III. CONTENTIONS

Plaintiff contends that the Freeport board breached its fiduciary duties by issuing one million RSUs to Adkerson. Plaintiff maintains a direct claim that the issuance violated the Freeport certificate of incorporation and bylaws,[27] a derivative claim that the issuance amounted to a bad faith breach of fiduciary duty,[28] and claims alleging that false and misleading statements and omissions in Freeport's 2014 proxy statement resulted in a breach of the board's duty of

---

[24] *Id.* ¶¶ 16-17, 23.
[25] *Id.* ¶ 17.
[26] *Id.* ¶ 35 (quoting Freeport's 2014 proxy statement).
[27] *Id.* ¶ 23.
[28] *Id.* ¶ 53.

6

disclosure.[29]  Defendants have filed this motion to dismiss Plaintiff's claims under Court of Chancery Rules 12(b)(6) and 23.1.  The Court addresses in turn each of Plaintiff's arguments below.

## IV.  ANALYSIS

A. *Procedural Standard of Review under Court of Chancery Rule 12(b)(6)*

On Defendants' motion to dismiss under Rule 12(b)(6), the Court must accept as true well-pled factual allegations in the Complaint and draw all reasonable inferences in favor of Plaintiff.[30]  The Court will not, however, accept as true conclusory allegations with no factual support or draw unreasonable inferences.[31]  The Court will grant the present motion only if Plaintiff "could not recover under any reasonably conceivable set of circumstances susceptible of proof."[32]  To the extent that Plaintiff's claims are reasonably conceivable, the Court must deny the motion.[33]

B. *Plaintiff's Direct Claim Alleging Violation of Freeport's Certificate of Incorporation and the Bylaws*

Plaintiff alleges that the Freeport "board's recognition and acknowledgement of [the Good Reason] claim and its grant of one million RSUs to

---

[29] *Id.* ¶¶ 36-44.
[30] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).
[31] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006).
[32] *Cent. Mortg.*, 27 A.3d at 536.
[33] *Id.*

resolve such a claim violated [Freeport's] certificate of incorporation and bylaws."[34] Plaintiff seems to argue that, because Delaware law allows boards of directors to amend a corporation's bylaws,[35] and because, except for one inapplicable exception, "no 'contractual' right to maintain an existing by-law has ever been recognized,"[36] the Company is insulated from any contract claim arising from such amendment and, therefore, the Board's grant of RSUs to Adkerson must have been in bad faith.

The Court finds this argument unpersuasive. First, at issue in this case is the Freeport board's grant of RSUs to Adkerson because of the impact of the bylaw amendments on his employment. The board amended the bylaws as an outgrowth of the merger challenged in the Related Action, but no challenges to those amendments survived the Related Action settlement. Adkerson does not (nor does any other Defendant) contend that the amendment of the bylaws was in any way improper; the Defendants simply acknowledge the possibility that the amendments could give rise to Adkerson's Good Reason claim. Therefore, arguments offered by Plaintiff regarding the authority of the board to amend the bylaws are largely inapposite.

---

[34] Compl. ¶ 18.

[35] Pl.'s Br. in Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Answering Br.") 16 (quoting *Kidsco Inc. v. Dinsmore*, 674 A.2d 483, 492 (Del. Ch.), *aff'd*, 670 A.2d 1338 (Del. 1995)).

[36] *Id.* (quoting *Kidsco*, 674 A.2d at 492 n.6).

Further, Plaintiff's leap from the proposition that the board has the authority to amend the bylaws to the conclusion that it is insulated from any breach of contract claim arising from such amendment is misplaced. That a corporation cannot be sued by contractual partners because of the consequences of a bylaw amendment does not follow from the premise that a corporation's board has the authority to amend the bylaws. As Defendants' reply brief notes, "[t]his result would mean that a corporation could negate any contractual undertaking to anyone . . . merely by the expedient of abrogating the contractual obligation in the guise of a bylaw amendment."[37] Such a result would deter creation of commercial contractual relationships with Delaware corporations in violation of Delaware's strong policy favoring freedom of contract and commercial efficiency.[38]

Even assuming the Court accepts Plaintiff's argument, the claim does not satisfy basic notice pleading requirements.[39] The alleged wrong is a breach of the certificate of incorporation and bylaws, yet Plaintiff fails in the Complaint and answering brief to identify any specific provision in either instrument the Freeport

[37] Defs.' Reply Br. 4.
[38] *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1059-60 (Del. Ch. 2006).
[39] Ct. Ch. R. 8(a); *Solomon v. Pathe Commc'ns Corp.*, 672 A.2d 35, 39 (Del. 1996) (holding that while Court of Chancery Rule 23.1 requires pleading facts with particularity in a derivative action, "the standard used to review a Chancery Rule 12(b)(6) motion to dismiss a stockholder class action suit is consistent with the notice pleading concept of Chancery Rule 8(a)." The pleading must, however, provide at least a "general notice of the claim asserted." *Id.* (quoting *Rabkin v. Philip A. Hunt Chem. Corp.*, 498 A.2d 1099, 1104 (Del. 1985)).

9

board may have breached. She merely states the proposition that the Freeport board had authority to amend the bylaws, and concludes therefrom that the board's grant of RSUs to Adkerson violated the certificate of incorporation and bylaws.[40] Where a plaintiff fails to identify any contract provision that was breached, the "count fails to state a claim upon which relief may be granted."[41]

Finally, Plaintiff alleges in connection with her direct claim that the Flores appointment and bylaw amendments did not diminish Adkerson's authority in any way that would implicate the Good Reason provision in the Employment Agreement. However, while the appointment of Flores as CEO of the oil and gas business did not reduce Adkerson's absolute authority (he retained authority over the mining business), it did reduce the proportion of the Company he managed. Additionally, the bylaw amendments subjected his authority to that of the Freeport board's chairman.[42] Moreover, Adkerson needed only to have a "good faith . . . reasonable belief" that the appointment of Flores and accompanying bylaw amendments triggered the Good Reason provision to bring a colorable claim.[43] Thus, Adkerson's potential Good Reason claim was at least "arguable," invoking

---

[40] Compl. ¶ 23.
[41] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 116 (Del. 2006).
[42] *See supra* note 13.
[43] Employment Agmt. Art. III § 4.

the business judgment rule,[44] which protects the board's RSU grant so long as it can be "attributed to any rational business purpose."[45]  Here, the Freeport board's desire to retain Adkerson as CEO and to avoid litigation clears this low hurdle. Therefore, Plaintiff's direct claim for breach of the certificate of incorporation and bylaws fails, and Defendants' motion to dismiss the direct claim is accordingly granted.[46]

## C. *Plaintiff's Derivative Claim Alleging Bad Faith Breach of Fiduciary Duty*

Plaintiff next alleges, derivatively on behalf of Nominal Defendant Freeport, that the Freeport board acted in bad faith by granting the RSUs to Adkerson.[47]  The

---

[44] *See Steiner v. Meyerson*, 1995 WL 441999, at *5 (Del. Ch. July 19, 1995) ("[D]isinterested directors [may] settle matters with a departing CEO who, in all events, had at least arguable claims under his employment agreement and who presumably . . . possessed skills and knowledge that it was advantageous to continue to have available to the corporation."); *accord White v. Panic*, 783 A.2d 543, 552 (Del. 2001).

[45] *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1373 (Del. 1995) (quoting *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del. 1985)) (internal quotation marks omitted).

[46] The Court notes for completeness Plaintiff's argument that because the Employment Agreement tied Adkerson's duties to the bylaws, and the board had the power to amend the bylaws, any such amendment would not give rise to a Good Reason claim.  This argument ignores that while a board may amend the bylaws, such amendment is not free from contractual rights that it may impair.  *See supra* text accompanying notes 37-38.

[47] Compl. ¶ 53.  The parties, in their briefs, argue this claim under both waste and bad faith standards and cite overlapping authority regarding the proper characterization of Plaintiff's claim.  *Compare In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27 (Del. 2006) (analyzing under waste standards a board's grant of a $130 million severance package to an executive terminated without cause), *with Steiner*, 1995 WL 441999, at *5 (stating that where a waste claim "entails" a bad

Supreme Court has characterized "bad faith" as requiring "intentional dereliction of dut[ies or] a conscious disregard for one's responsibilities."[48]  "Bad faith cannot be shown by merely showing that the directors failed to do all they should have done under the circumstances.  Rather, [o]nly if they knowingly and completely failed to undertake their responsibilities would they breach their duty of loyalty."[49] It is with this standard in mind that the Court analyzes Plaintiff's derivative claims.

### 1. Procedural Standard of Review under Court of Chancery Rule 23.1

Under Court of Chancery Rule 23.1, a stockholder may not bring a derivative action on behalf of the corporation unless she has made a demand on the board to institute litigation which has been wrongfully refused, or plead particularized facts "creating reasonable doubt that either (1) the directors are disinterested and independent or (2) the challenged transaction was otherwise the product of valid business judgment," thereby demonstrating that any demand

---

faith claim, it would be analyzed as a breach of fiduciary duties).  Because the Court concludes that, in this case, the result would be the same under either standard, and given Defendants' concession that the two standards are "similar," Defs.' Reply Br. 9, the Court analyzes Plaintiff's derivative claims under the bad faith standard.

[48] *Walt Disney*, 906 A.2d at 66.

[49] *Wayne Cnty. Empls.' Ret. Sys. v. Corti*, 2009 WL 2219260, at *14 (Del. Ch. July 24, 2009), *aff'd*, 996 A.2d 795 (Del. 2010) (alteration in original) (internal quotation marks omitted).

would have been futile.[50] The rationale for requiring such a demand is twofold: it "implement[s] the principle that the cause of action belongs to the corporation, not the stockholder plaintiff,"[51] and gives the "corporation the opportunity to rectify an alleged wrong without litigation."[52]

Plaintiff contends that demand in this case would have been futile, and is therefore excused, for two reasons. First, she alleges that the decision to award the RSUs to Adkerson was not a business decision, but a legal decision, which is not protected by the business judgment rule and therefore not subject to the Rule 23.1 demand requirements.[53] Plaintiff is correct that, to obtain protection under the business judgment rule and therefore implicate demand requirements, a board's act must be a business decision and not a legal decision.[54] This truism is, however, inapposite to this case. The Complaint alleges harm caused by the Freeport board's grant of RSUs to Adkerson—not by its determination that Adkerson's claim is "arguably" meritorious. Plaintiff seems to imply, however, that the

---

[50] Ct. Ch. R. 23.1; *Del. Cnty. Empls. Ret. Fund v. Sanchez*, 2015 WL 5766264, at *2 (Del. Oct. 2, 2015); *accord Aronson v. Lewis*, 473 A.2d 805, 813-15 (Del. 1984).
[51] *White*, 783 A.2d at 546.
[52] *Aronson*, 473 A.2d at 809.
[53] Compl. ¶ 56.
[54] *Grayson v. Imagination Station, Inc.*, 2010 WL 3221951, at *6 (Del. Ch. Aug. 16, 2010) ("[Q]uestions of law can only be determined by the Court and, therefore, the business judgment rule does not apply. Because the business judgment rule does not apply, the derivative suit requirements have no relevance, and [such] claims . . . are necessarily individual.").

13

board's grant of RSUs was based on its opinion regarding the merits of the Good Reason claim. This argument, too, must fail. The board did not form an opinion regarding the viability of the Good Reason claim on its own accord. It instead hired an expert who advised that the appointment of Flores and accompanying bylaw amendments may have triggered the Good Reason provision.[55] The board's relevant decision, then, was granting the RSUs in order to avoid potential litigation; litigation that, given the compensation consultant's advice, the board could reasonably have viewed as meritorious. The cases Plaintiff cites supporting her proposition that legal decisions are not protected by the business judgment rule all arise in the context of a board's acting outside the scope of its authority.[56]

---

[55] Compl. ¶ 26.

[56] *Allen v. El Paso Pipeline GP Co.*, 90 A.3d 1097, 1108 (Del. Ch. 2014) ("Boards of directors have no discretion to exceed the intra-entity limitations on their authority. . . . Without authority to take the action in question, a board has no business judgment to exercise."); *Grayson*, 2010 WL 3221951, at *5 ("[D]efendants are alleged to have gone beyond the authority granted to them by the Company's shareholders. . . . These alleged acts go against the structural relationship established by the shareholders, and it is consequently the shareholders who were directly harmed-not the Company."). In *Grimes v. Donald*, 673 A.2d 1207, 1212 (Del. 1996), the Supreme Court held that whether an employment agreement violates Section 141 of the Delaware General Corporation Law is a "question of law directly concerning the legal character of the contract and its effect upon the directors" and is therefore not subject to business judgment rule protection. Notably, however, the Court held that:

> If an independent and informed board, acting in good faith, determines that the services of a particular individual warrant large amounts of money, whether in the form of current salary or severance provisions, the board has made a business judgment. That judgment

14

Thus, while a decision regarding the validity of a contract may be a legal decision not subject to the protections of the business judgment rule, the decision to grant a severance payment, or, as here, a payment in lieu thereof, is a business decision and accordingly remains subject to applicable demand futility requirements.

Second, Plaintiff alleges that demanding that the board initiate litigation in this case would have been futile and is therefore excused because "the transaction is so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists."[57] Plaintiff's argument regarding the egregiousness of the transaction, however, depends on the Court's analysis of the directors' acts and the viability of the Good Reason claim, and is therefore analyzed with respect to the merits of the bad faith claim below.

2. <u>The Directors Did Not Act in Bad Faith in Approving the Grant of One Million RSUs to Adkerson</u>

Plaintiff's derivative claim centers on the allegation that the Freeport board's grant of RSUs to the Company's CEO Adkerson was so egregious as to constitute

---

normally will receive the protection of the business judgment rule unless the facts show that such amounts, compared with the services to be received in exchange, constitute waste or could not otherwise be the product of a valid exercise of business judgment.

*Id.* at 1215.

[57] Compl. ¶ 55.

bad faith.[58]  To substantiate this argument, Plaintiff alleges that the board had two defenses to the Good Reason claim—acquiescence and public policy considerations—and that therefore Adkerson's promise in return for the grant of RSUs to refrain from terminating the Employment Agreement and bringing the Good Reason claim was worthless.  The Court analyzes each of these potential defenses below, keeping in mind that, to bring a successful Good Reason claim, Adkerson must merely have had a "good faith . . . reasonable belief" that the Good Reason provision had been triggered.[59]

(a) *The Board would likely not have had an Acquiescence Defense to Adkerson's Good Reason Claim*

Plaintiff argues that Adkerson acquiesced to the governance changes that England, the compensation consultant, stated may have triggered the Good Reason provision in the Employment Agreement, and that such acquiescence bars any related claim.[60]  The argument is essentially that because Adkerson approved the appointment of Flores and associated bylaw amendments, because the Company's board knew of such approvals, and because the Company's board knew that consent to corporate action would bar any Good Reason challenge,[61] the board

---

[58] *Id.* ¶ 53.

[59] Employment Agmt. Art. III § 4.

[60] Compl. ¶ 28.

[61] This conclusion is doubtful, but the Court nonetheless states it to complete the logical maze required to find for Plaintiff on this issue.  The Court further notes that the "knowledge" alleged by Plaintiff would have to have been inferred by the

16

must have known that Adkerson's consent to the above decisions abrogated his Good Reason claim.

Plaintiff relies heavily on *Klaassen v. Allegro Dev. Corp.*[62] in support of her argument that Adkerson's approval bars his Good Reason claim. In *Klaassen*, however, the executive challenged the merits of a board decision[63]—he did not assert, as Shaev does here, contract rights triggered as a result of the decision. Further, in *Klaassen*, the executive, after his removal but prior to his Section 225 challenge arising therefrom, helped his replacement learn about the industry and company operations, indicated that he would hold his replacement accountable as CEO, provided feedback on his replacement's employment agreement, and assisted in the selection of his replacement management team.[64] Here, however, Adkerson engaged in no such activities.[65]

Plaintiff, however, argues that Adkerson's approval of Flores's appointment and the bylaw amendments amount to such acquiescence. This argument fails for

---

board from England's statement regarding a reduction in base salaries of Moffett and Flores, and then reapplied to the facts at bar. *Id.* ¶ 26. Though outside the scope of this opinion, the Court notes that grasping a legal concept in one context and reapplying it to the facts of another is a task generally not within a board's purview. *See supra* note 54 and accompanying text.

[62] 106 A.3d 1035 (Del. 2014).

[63] *Id.* at 1037.

[64] *Id.* at 1041.

[65] In fact, he explicitly stated to the board that "this matter needs to be addressed prior to year-end 2013." Neal Aff. Ex. 6 at 3 (minutes from the October 28 compensation committee meeting).

two reasons. First, as stated above, Adkerson is not challenging the Flores appointment and bylaw amendments to which he agreed—he is merely asserting rights that resulted from those events.[66] Second, Adkerson agreed to the bylaw changes only after Moffett, the Freeport board chairman, assured him that such "changes to the by-laws would have no impact on Mr. Adkerson's rights under his employment agreement."[67] While Plaintiff argues that this statement "actually means . . . that the changes would not reduce Adkerson's authority,"[68] Defendants argue that it meant that Adkerson would still have all rights under his Employment Agreement. Regardless of whose interpretation is more accurate, so long as Adkerson had a "good faith . . . reasonable belief"[69] that the provision remained valid, his claim is at least "arguable" which, as Plaintiff concedes, is "the minimum standard for settling a CEO's claim against his company."[70]

More importantly, a logical extrapolation of Plaintiff's argument that Adkerson's agreement to the governance changes barred his Good Reason claim is

---

[66] Plaintiff cites *Wechsler v. Abramowitz*, 1984 WL 8244 (Del. Ch. Aug. 30, 1984), and *Gottlieb v. McKee*, 107 A.2d 240 (1954), to support her conclusion that a director's or officer's approval of a transaction precludes a later challenge to it. As stated, however, this argument is inapposite—Adkerson is not challenging the board's decision to install Flores as Adkerson's co-CEO or amend the bylaws; he is simply invoking a right in his Employment Agreement triggered by the decision.
[67] Pl.'s Answering Br. 12; Neal Aff. Ex. 5 at 2 (minutes from the April 17, 2013 board meeting).
[68] Pl.'s Answering Br. 12.
[69] Compl. ¶ 45.
[70] Pl.'s Answering Br. 23; *Steiner v. Meyerson*, 1995 WL 441999, at *5 (Del. Ch. July 19, 1995).

that a director's or officer's agreement to a board's decision nullifies any contractual right vesting in such director or officer therefrom. This Court has, however, held otherwise.[71] Even assuming, purely for the sake of argument, Plaintiff's contention that approval of a transaction nullifies claims arising from such approval, Plaintiff has still failed to demonstrate that the board's decision to grant Adkerson additional compensation would violate its fiduciary duties. Adkerson would still be free to bring suit against the Company, and the board's decision to compromise such a claim is within its business judgment.[72] Therefore, the Company's possible acquiescence defense to Adkerson's potential Good Reason claim is not sufficient to characterize the board's grant of RSUs as in bad faith.

---

[71] *See, e.g.*, *Hamilton P'rs, L.P. v. Highland Capital Mgmt., L.P.*, 2014 WL 1813340, at *9 (Del. Ch. May 7, 2014) (dismissing allegations of breach of fiduciary duty against CEO of a company who declined to prevent a third-party stock purchase that would trigger "change-in-control rights" in the CEO's employment agreement worth $6.6 million, and who eventually agreed to remain CEO and receive an additional $5 million in compensation in exchange for not exercising such rights). Whether spun as a decision against his self-interest by limiting his own authority, or a decision favoring his personal interest by implicating the Good Reason provision, the bottom line is that Adkerson, as a director, was obligated to make a decision that he believed was in the best interests of the company. A challenge to Adkerson's decision may take the form of a fiduciary duty claim, but the Court is unwilling to hold, without more, that discharging one's directorial responsibility in accordance with applicable fiduciary duty standards amounts to acquiescence.

[72] *White*, 783 A.2d at 552 ("The decision to approve the settlement of a suit against the corporation is entitled to the same presumption of good faith as other business decisions taken by a disinterested, independent board.").

19

(b) *The Board would likely not have had a Public Policy Defense to Adkerson's Good Reason Claim*

Plaintiff alleges that the Good Reason provision of Adkerson's Employment Agreement was void as a matter of public policy, and therefore the board's grant of the RSUs to Adkerson was in bad faith.[73] Plaintiff's argument is essentially that the maximum allowable payment to Adkerson was $2.6 million because that is the amount that would have been due under the Employment Agreement had the compensation committee notified Adkerson of its desire to terminate the agreement in December 2013.[74]

Plaintiff characterizes the Good Reason provision as a liquidated damages provision and argues that Delaware law forbids parties to a contract from imposing early termination penalties.[75] Delaware courts, however, routinely uphold similar provisions in executive employment agreements.[76] Plaintiff attempts to distinguish the facts of *Andreessen* by noting that the Court did not characterize the severance

---

[73] Compl. ¶ 33; Pl.'s Answering Br. 13.

[74] Compl. ¶¶ 18, 31, 33.

[75] Pl.'s Answering Br. 13.

[76] *See, e.g.*, *Zucker v. Andreessen*, 2012 WL 2366448, at *8-9 (Del. Ch. June 21, 2012) (upholding an optional severance payment worth over $40 million, and holding that past performance at the company, among other factors, can justify such a payment); *Brehm v. Eisner*, 746 A.2d 244, 263, 266 (Del. 2000) ("It is the essence of business judgment for a board to determine if a particular individual warrant[s] large amounts of money, whether in the form of current salary or severance provisions," and that "[t]o rule otherwise would invite courts to become super-directors, measuring matters of degree in business decisionmaking and executive compensation. Such a rule would run counter to the foundation of our jurisprudence." (first alteration in original) (internal quotation marks omitted)).

payment as a liquidated damages provision. In that case, however the payment was optional, yet the Court still upheld the grant.[77] Contrary to Plaintiff's argument, this fact makes Defendants' grant of RSUs more reasonable—not only was the $46 million severance payment expressly provided in the Employment Agreement, but the RSU grant was valued at $11 million less than the Good Reason claim and the board retained Adkerson's services as CEO. Even if the board had the authority to terminate Adkerson's Employment Agreement without paying the Good Reason claim, however, Plaintiff has cited no authority indicating that it would be obligated to do so. In fact, this Court has held otherwise.[78] Therefore, the board's public policy defense to Adkerson's potential Good Reason claim is not sufficient to characterize the board's grant of RSUs as in bad faith.

Finally, as stated above, Plaintiff alleges bad faith, necessitating a showing that the Freeport board consciously disregarded its fiduciary responsibilities.[79] To the contrary, however, the board here employed a compensation consultant, met multiple times regarding the potential Good Reason claim, and finalized an agreement that resolved the Good Reason claim, reduced and deferred the potential

---

[77] *Andreessen*, 2012 WL 2366448, at *8-9.
[78] *See supra* note 76.
[79] *Walt Disney*, 906 A.2d at 66.

21

cash outlay, and retained Adkerson as CEO. Thus, the directors did not act in bad faith with regard to their decision to grant one million RSUs to Adkerson.[80]

Because the Freeport board did not act in bad faith, Plaintiff's demand would not have been futile and is therefore not excused, and the Court accordingly grants Defendants' motion to dismiss with respect to the derivative claims.

## D. *Plaintiff's Claim Alleging Bad Faith Breach of the Board's Disclosure Duty*

While Defendants argue that the Freeport stockholders' vote at the 2014 annual meeting to approve the board's grant of RSUs to Adkerson insulates the transaction from Plaintiff's attack,[81] Plaintiff alleges that the vote was not fully informed because Freeport's 2014 proxy statement contained material false

---

[80] The Court notes, to be clear, that were Plaintiff's claim analyzed solely under a waste standard (as Defendants initially argued as the appropriate standard, *see supra* note 47), the Court would reach the same result. There, Plaintiff would have to prove that the Freeport board's grant of the RSUs to Adkerson was "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *Walt Disney*, 906 A.2d at 74 (Del. 2006) (quoting *Brehm*, 746 A.2d at 263). As held, the potential success of Adkerson's Good Reason claim was at least arguable, if not probable. Therefore, a reasonable business person could conclude that retaining Adkerson as CEO and precluding his Good Reason claim constituted sufficient consideration for the RSU grant. Notwithstanding the merits of the Good Reason claim, retaining Adkerson as CEO is alone sufficient consideration to justify the grant and preclude a waste claim. *See supra* note 76.

[81] Defs.' Reply Br. 22. *See Corwin v. KKR Fin. Hldgs. LLC*, 2015 WL 5772262 (Del. Oct. 2, 2015).

statements and omissions and therefore cannot act to insulate such a transaction from stockholder challenge.[82]

1. The Freeport Board's Duty of Disclosure Generally

Directors have a duty of disclosure that is said to "flow[] from" their broader duties of care and loyalty.[83]   Essentially, directors, when communicating to stockholders, "are under a fiduciary duty to disclose fully and fairly all material information within the board's control."[84]  "The essential inquiry in such an action is whether the alleged omission or misrepresentation is material."[85]  The Delaware Supreme Court has defined material facts as "those . . . for which there is a substantial likelihood that a reasonable person would consider [them] important in deciding how to vote."[86]

"Corporate fiduciaries can breach their duty of disclosure under Delaware law . . . by making a materially false statement, by omitting a material fact, or by making a partial disclosure that is materially misleading."[87]  To state a claim for false statement, "a plaintiff must identify (1) a material statement or representation

---

[82] Compl. ¶¶ 36-44; *see also Solomon v. Armstrong*, 747 A.2d 1098, 1114 (Del. Ch. 1999), *aff'd*, 746 A.2d 277 (Del. 2000) ("[F]ully informed shareholder ratification will insulate a board action from subsequent legal attack by shareholders.").

[83] *Turner v. Bernstein*, 1999 WL 66532, at *5 (Del. Ch. Feb. 9, 1999).

[84] *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992).

[85] *Malone v. Brincat*, 722 A.2d 5, 12 (Del. 1998).

[86] *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009) (second alteration in original) (internal quotation marks omitted).

[87] *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 916 (Del. Ch. 1999).

in a communication contemplating stockholder action (2) that is false."[88] To state a claim on the basis of an omission, "a plaintiff must plead facts identifying (1) material, (2) reasonably available (3) information that (4) was omitted from the proxy materials."[89] With regard to omissions, materiality requires a showing that "the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder" to the extent that it could be "viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[90]

## 2. Plaintiff's Disclosure Allegations

Plaintiff alleges both material false statements and material omissions. She further asserts that such omissions and false statements are material because they concern important information regarding the independence of director candidates and advisability of director compensation, thereby compromising the 2014 director election and say-on-pay vote. Specifically, Plaintiff alleges four disclosure violations—two false statements and two omissions. The Court considers each in turn.

---

[88] *Id.* at 920.

[89] *Id.* at 926.

[90] *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

(a) *Plaintiff's False Statement Allegations*

First, Plaintiff alleges that the board breached its duty of disclosure by stating, in Freeport's 2014 proxy materials, that the $35 million grant of RSUs to Adkerson "was $11 million less than the potential cash payout under Mr. Adkerson's employment agreement."[91] In connection with this allegation, Plaintiff alleges that the board omitted the fact that Freeport was liable to Adkerson for only $2.6 million given that his Employment Agreement had only one year to run (assuming that the compensation committee had properly terminated the agreement), and that $46 million was an unenforceable penalty.[92] To reach this conclusion, however, the Freeport board would have to have analyzed the Company's legal defenses applicable to Adkerson's Good Reason claim and speculated as to the potential outcome. Therefore, this desired disclosure would have required the board to disclose Plaintiff's legal theory—namely, that Adkerson's Good Reason claim was unenforceable. This Court has held, however, that "as a general rule, proxy materials are not required to state 'opinions or possibilities, legal theories or plaintiff's characterization of the facts.'"[93] Further,

---

[91] Compl. ¶¶ 35-36.

[92] *Id.* ¶ 39.

[93] *In re MONY Gp., Inc. S'holder Litig.*, 853 A.2d 661, 682 (Del. Ch. 2004), *as revised* (Apr. 14, 2004) (quoting *Seibert v. Harper & Row, Publishers, Inc.*, 1984 WL 21874, at *6 (Del. Ch. Dec. 5, 1984)); *accord Williams v. Geier*, 1987 WL 11285, at *5 (Del. Ch. May 20, 1987) ("[P]roxy materials need not disclose legal theories").

not only is Plaintiff's desired disclosure immaterial, but it might have been inappropriate to include in the proxy materials such a speculative conclusion.[94]

Second, Plaintiff alleges that the Freeport board's statement in the 2014 proxy materials that Adkerson's Good Reason termination claim was due to "the resulting new executive management structure" was false or misleading because such phraseology implies that the management structure was an unforeseeable consequence of the underlying transaction, as opposed to a structure that was deliberately established as a part thereof.[95] As a threshold matter, the Court fails to recognize, and Plaintiff fails to explain, why this distinction is material. Plaintiff seems to argue that, because the board knew, prior to approving the acquisition of PXP, that the stated governance changes would occur, it therefore misled the shareholders when it implied that the governance changes were unanticipated. Even assuming Freeport stockholders would consider such information to be material, however, the Court is unwilling to find a disclosure violation where the board *understates* its diligence, yet the transaction is nonetheless approved by

---

[94] *In re Family Dollar Stores, Inc. S'holder Litig.*, 2014 WL 7246436, at *21 (Del. Ch. Dec. 19, 2014); *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 145 (Del. 1997) ("Speculation is not an appropriate subject for a proxy disclosure.").
[95] Compl. ¶ 37.

26

stockholders. Generally, disclosure claims allege that the board in fact conducted less diligence than claimed.[96]

Finally, as Defendants note, Plaintiff failed to support this claim in her answering brief, and it is therefore waived.[97] Thus, Defendants' motion to dismiss is granted with respect to Plaintiff's disclosure violation claims alleging false or misleading statements in Freeport's 2014 proxy statement.

(b) *Plaintiff's Material Omission Allegations*

First, Plaintiff alleges that the Freeport board omitted from the 2014 proxy statement the fact that Adkerson's Employment Agreement had only one year remaining as of December 19, 2013 and that the board was aware of this fact.[98] Again, however, Plaintiff fails to allege why this omission was material. Such a failure is fatal to Plaintiff's claim:

> A claim based on disclosure violations must provide some basis for a court to infer that the alleged violations were material. For example, a pleader must allege that facts are missing from the proxy statement, identify those facts, state why they meet the materiality standard and how the omission caused injury.[99]

---

[96] *See, e.g.*, *Gantler v. Stephens*, 965 A.2d 695, 711 (Del. 2009) ("[A] board cannot properly claim in a proxy statement that it had carefully deliberated and decided that its preferred transaction better served the corporation than the alternative, if in fact the Board rejected the alternative transaction without serious consideration.").

[97] *Forsythe v. ESC Fund Mgmt. Co. (U.S.)*, 2007 WL 2982247, at *11 (Del. Ch. Oct. 9, 2007).

[98] Compl. ¶ 38.

[99] *Loudon*, 700 A.2d at 141 (footnotes omitted).

Plaintiff's sole argument regarding the duration of the Employment Agreement is that, because the compensation committee could have terminated the agreement in 2013, the maximum allowable severance payment was $2.6 million. As stated, however, such a conclusion would require speculative legal analysis, and would likely result in a contrary conclusion.[100] In addition, the Freeport board valued Adkerson's services and did not wish to see him leave the Company, and therefore likely did not desire to terminate his Employment Agreement as Plaintiff alleges it could have.[101] The Freeport board was not required to make a speculative legal determination and act in accordance therewith.[102] Accordingly, the Freeport board's right to terminate the Employment Agreement is irrelevant with respect to the 2014 proxy statement and accompanying director election and say-on-pay vote.[103]

Second, Plaintiff alleges that the Freeport board violated its disclosure duty by stating that the RSU grant "simultaneously convert[s] a potential right to receive immediate cash into a stock grant . . . and defers the monetization of the grant until after Mr. Adkerson's retirement," because the statement fails to disclose

---

[100] *See supra* notes 76, 94 and accompanying text.

[101] Compl. ¶ 35 (quoting an excerpt from Freeport's 2014 proxy statement stating that the RSU grant "served the best interests of our shareholders by . . . retaining an experienced and skilled CEO at a time of significant transformation of our company").

[102] *See supra* notes 93-94 and accompanying text.

[103] Notwithstanding the omission's immateriality, the details of the employment agreement were disclosed in Freeport's 2008 Form 10-K. Pl.'s Answering Br. 20.

that the Company must report the expense associated with the RSU grant on its 2013 income statement.[104]  Again, however, the Court fails to recognize, and Plaintiff fails to explain, the materiality of such an omission.  Plaintiff's claim that the Company's recording of the expense in 2013 makes false the statement that the RSU grant "deferred monetization until after Mr. Adkerson's retirement" is misplaced.  First, the board's use of the term "monetization" in and of itself implies a distinction between a cash outlay and an accounting expense.  Second, Freeport's recognition of the RSU grant to Adkerson in its 2013 income statement conformed to Generally Accepted Accounting Principles ("GAAP").[105]  Finally, Plaintiff's failure to explain the materiality of the Freeport board's failure to disclose in its 2014 proxy materials the already publicly-available information regarding proper accounting treatment of the RSU grant is outcome determinative in and of itself.[106]  Thus, Defendants' motion to dismiss is granted with respect to Plaintiff's disclosure violation claims alleging material omissions from Freeport's

---

[104] Compl. ¶¶ 40-41.

[105] Plaintiff attempts to rebuff this argument by contending that Defendants improperly injected this "fact" into the record.  Financial accounting standards are, however, public documents subject to judicial notice pursuant to Delaware Rule of Evidence 201(b) as "not subject to reasonable dispute."  *See, e.g.*, *Fiat N. Am. LLC v. UAW Retiree Med. Benefits Trust*, 2013 WL 3963684, at *15 n.105 (Del. Ch. July 30, 2013) (taking judicial notice of both GAAP and International Financial Reporting Standards).  Such accounting standards require same-period expensing of stock and option grants.  *See Desimone v. Barrows*, 924 A.2d 908, 921 n.24 (Del. Ch. 2007).

[106] *See supra* text accompanying note 99.

2014 proxy statement. Accordingly, the stockholders were fully informed at Freeport's 2014 annual meeting when they voted to reelect the board and approve the say-on-pay proposal, and such stockholder approval "insulates the transaction from all attacks other than on the grounds of waste."[107]

(c) *No Available Remedy for Alleged Disclosure Violations*

Even assuming, for argument's sake, that Plaintiff's disclosure allegations are valid, there is no relief available to Plaintiff for the alleged disclosure violations. Plaintiff's Complaint challenges the Freeport board's disclosures in its April 2014 proxy statement,[108] and her answering brief requests, with respect to the disclosure violations, declarations that the votes at the 2014 stockholders meeting electing directors and approving the say-on-pay proposal were void.[109] Such relief, however, is no longer practical. As this Court has held: "[A] breach of the disclosure duty leads to *irreparable harm. . . .* [O]nce this irreparable harm has occurred-*i.e.,* when shareholders *have* voted without complete and accurate information-it is, by definition, too late to remedy the harm."[110] In this case, Freeport's 2015 annual meeting occurred on June 10th, at which time Freeport's

---

[107] *KKR Fin. Hldgs.*, 2015 WL 577262, n.13.
[108] Compl. ¶ 34.
[109] Pl.'s Answering Br. 26; Compl. ¶¶ D-E.
[110] *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 360-61 (Del. Ch. 2008).

entire board was again reelected.[111] Thus, as the Complaint itself admits,[112] the alleged 2014 proxy disclosure violations are moot.[113]

In an attempt to sustain her disclosure claim, Plaintiff alleges two alternative theories for relief. First, she argues that, in *Malone v. Brincat*,[114] the Supreme Court "suggested" that it may remedy bad faith breaches of disclosure duties by removing or disqualifying directors.[115] Plaintiff mischaracterizes *Malone*. There, while affirming this Court's dismissal of a disclosure duty claim, the Supreme Court stated that it "express[es] no opinion whether equitable remedies such as injunctive relief, judicial removal of directors or disqualification from directorship could be asserted here."[116] Second, Plaintiff argues that the Court should render an opinion on her duty of disclosure claims so that, should the Court find that the Freeport board breached its duty of loyalty, a Freeport stockholder could bring a later § 225 action to remove the violating directors.[117] Plaintiff cites *Shocking*

---

[111] Tr. of Oral Arg. on Defs.' Mot. to Dismiss at 29 (June 18, 2015).

[112] Compl. ¶ 3.

[113] *Loudon*, 700 A.2d at 141 n.18 (citing *Buckley v. Archer-Daniels-Midland Co.*, 111 F.3d 524 (7th Cir.1997), to support the proposition that an allegation that a board violated its duty of disclosure in connection with its issuance of a proxy statement prior to an annual meeting is moot where, at the time of the suit, the officers elected at that meeting had completed their terms and been reelected).

[114] 722 A.2d 5 (Del. 1998).

[115] Pl.'s Answering Br. 27 (quoting *Malone*, 722 A.2d at 14 n.46).

[116] *Malone*, 722 A.2d at 14 n.46.

[117] Pl.'s Answering Br. 27.

*Tech., Inc. v. Michael*[118] to support this claim. There, however, the Court merely stated that "[i]f Shocking prevails on [its fiduciary duty] claim and Michael is found to have violated his duty of loyalty, it is possible that such a judgment could serve as the basis for a [later] § 225(c) action."[119] Such an assertion does not support Plaintiff's contention that the Court should render an advisory opinion on a mooted fiduciary duty claim so that stockholders, who have since reelected the same directors, could later seek removal of such directors in a Section 225 action. Plaintiff's disclosure violation allegations must accordingly be dismissed as invalid and for failure of remedy.

## V. CONCLUSION

For the foregoing reasons, the Defendants' motion to dismiss is granted as to the direct claims under Court of Chancery Rule 12(b)(6) and as to the derivative claims under Court of Chancery Rule 23.1.

An implementing order will be entered.

---

[118] 2012 WL 1352431 (Del. Ch. Apr. 10, 2012).
[119] *Id.* at *1.